# STATE OF CONNECTICUT *v.* FELIX R.*
## (AC 33681)

Lavine, Sheldon and Pellegrino, Js.

Argued March 11—officially released December 24, 2013

* In accordance with our policy of protecting the privacy interest of the victims of sexual assault and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the complainant or others through whom the complainant's identity may be ascertained. See General Statutes § 54-86e.

*Stacey Van Malden*, pro hac vice, with whom were *Kathryn Giusio* and, on the brief, *Glenn W. Falk*, assigned counsel, for the appellant (defendant).

*James M. Ralls*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael A. Pepper*, senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. Our federal and state constitutions guarantee a criminal defendant the rights to compel the state to prove its case beyond a reasonable doubt at a public trial, to confront the witnesses against him, and to assert a vigorous defense. See U.S. Const., amend. VI; Conn. Const., art. first, § 8. A prosecutor who argues to a jury that there is something inappropriate about a defendant's assertion of these fundamental rights jeopardizes the integrity of the process. Unfortunately, this is a case in which such prosecutorial impropriety "so infected the trial with unfairness as to make the resulting conviction a denial of due process." (Internal quotation marks omitted.) *Darden* v. *Wainwright*, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986).

The defendant, Felix R. appeals from the judgment of conviction, rendered after a jury trial, of two counts

of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), two counts of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (2), one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (E), and three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). The issue on appeal is whether certain remarks made by the prosecutor, Michael Pepper, in closing argument denied the defendant a fair trial by unduly burdening his constitutional rights to put the state to its proof in a jury trial, to confront witnesses against him, and to present a defense pursuant to the sixth and fourteenth amendments to the United States constitution[1] and article first, § 8, of the constitution of Connecticut.[2] We conclude that the remarks the prosecutor made during final argument were improper and that the state has failed to demonstrate that the impropriety was not likely to affect the jury's verdict. We therefore reverse the judgment of conviction.

The jury reasonably could have found the following facts beyond a reasonable doubt. The complainant, the defendant's daughter, was born in the Dominican Republic to parents who never married one another. The defendant moved to the United States, and the

---

[1] The sixth amendment to the United States constitution provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . and . . . to be confronted with the witnesses against him . . . and to have the assistance of counsel for his defense." See also *Faretta* v. *California*, 422 U.S. 806, 818–19, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). "The sixth amendment is applicable to the states through the fourteenth amendment. *Pointer* v. *Texas*, 380 U.S. 400, 405, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965)." *Phillips* v. *Warden*, 220 Conn. 112, 114 n.1, 595 A.2d 1356 (1991).

[2] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . to be confronted by the witnesses against him . . . and in all prosecutions by information, to a speedy, public trial by an impartial jury."

complainant continued to live with her mother in the Dominican Republic until 2005 when she moved to the United States to live with the defendant and her paternal grandmother. At the time she came to the United States, the complainant was ten years old and spoke no English. Her mother remained in the Dominican Republic.

The defendant began to touch the complainant in a sexual manner approximately three months after she arrived in Connecticut. On occasion the defendant tried to kiss her and have her touch his penis. In 2006, the defendant took the complainant to a mental health clinic because she wept frequently, was having difficulty sleeping, and was anxious. When she was seen at the clinic, the complainant did not mention the defendant's sexual advances toward her because the defendant had threatened to hurt her if she told anyone about it. At trial, the clinical psychologist who counseled the complainant, Patricia Nogelo, testified that she saw the complainant for individual and family therapy. According to Nogelo, the complainant did not have mental health problems but needed help adjusting to her new life in Connecticut.

The complainant attempted to tell her mother about the defendant's sexual advances by writing her a letter. She asked the defendant to deliver the letter when he traveled to the Dominican Republic. The complainant does not know whether her mother ever received the letter. In late 2007 or early 2008, the complainant and the defendant together visited the Dominican Republic. During their visit, the complainant told her paternal aunt that the defendant abused her. The paternal aunt confronted the defendant, who denied the accusations of abuse. The complainant's paternal aunt then accused the complainant of being a liar. In late 2008, the complainant's maternal aunt, Mercedes, asked the complainant about a letter in which the complainant had

stated that she did not want to live with the defendant and threatened to commit suicide. The complainant told Mercedes that the contents of the letter were untrue. In March, 2009, a representative of the Department of Children and Families (department) visited the complainant at her school. When the representative from the department asked the complainant whether she was being sexually abused, the complainant gave a negative response. The complainant later stated that she was afraid to tell anyone about the defendant's sexual advances because she was fearful; the defendant was sometimes aggressive. The complainant did not know who had contacted the department about her situation.

On the morning of May 9, 2009, when the complainant was fourteen, the defendant awakened her by touching her breasts. The defendant held the complainant's hands above her head and took off her pajamas. The complainant asked the defendant to stop, but he covered her mouth, told her to shut up, and forced her to engage in sexual intercourse. The defendant used a condom, but it broke. The complainant saw "white stuff" in the broken condom and on her body. The defendant instructed the complainant not to tell anyone what had occurred. Later that morning, the defendant purchased a pregnancy test and Plan B (morning after pill).[3] He directed the complainant to take one of the morning after pills and gave her a second pill approximately twelve hours later. On May 12, 2009, the defendant gave the complainant a pregnancy test, which produced a negative result.

During the Memorial Day weekend of 2009, the defendant took the complainant to New York City, where she visited Mercedes. During the visit, the complainant told Mercedes that, for more than a year, the defendant

---

[3] Plan B is the commercial name for a form of oral contraception known as the morning after pill.

had been sexually abusing her when he was drinking, had sexual intercourse with her, and had purchased a morning after pill for her. The complainant told Mercedes that she did not want to return to Connecticut and be abused by the defendant again. Mercedes told the complainant that she could not do anything from New York, but advised her to tell her guidance counselor.

The complainant telephoned the defendant from New York and told him that she did not want to return home because she did not want to be abused any longer. The defendant instructed her to come home and not to tell anyone about the sexual abuse. On the Wednesday following the Memorial Day holiday, the complainant took the train to Connecticut. On Thursday morning, May 28, 2009, the defendant touched the complainant while she was sleeping. The complainant awakened, pushed the defendant away, and slapped him. The defendant left the complainant alone but warned her not to tell anyone or he would do something to her.

The complainant went to school and reported the defendant's sexual abuse to her guidance counselor. She told her guidance counselor that the defendant had touched her breasts that morning and had done so many times previously. She also told him that the defendant had penetrated her and threatened to send her back to the Dominican Republic if she told anyone about it. Moreover, the complainant also stated that she was afraid to go home from school. The guidance counselor telephoned the department hotline to report what the complainant had told him. A department social worker, Tira Gant, interviewed the complainant at school. The department placed the complainant in foster care that day.

Later, on the evening of May 28, 2009, department personnel informed the defendant of the complainant's

accusations and that she was being removed from his home. The defendant denied having abused the complainant. He stated that he knew that the complainant would accuse him because he had accused her of having been with a boy while she was in New York during the Memorial Day holiday. He claimed that the complainant was angry with him for having confronted her about the boy. He acknowledged, however, that during the previous year, the complainant's mother had accused him of having sexually abused the complainant.

Detective John Ventura interviewed the defendant. The defendant told Ventura that, on a couple of occasions, he had taken the complainant to the hospital for an evaluation because he thought she was having sex with a boy. The defendant claimed that the hospital had refused to see the complainant on those occasions for "ethical reasons." The defendant also informed Ventura that the complainant slept in his bed because she was not getting along with her paternal grandmother, and that he saw nothing wrong with the complainant's sleeping with him. When Ventura asked the defendant if he had purchased a pregnancy test for the complainant, the defendant became excited and extremely nervous. He denied having purchased a pregnancy test and claimed that the complainant had used his credit card without telling him why. He also denied that he had bought the complainant a morning after pill.

The following day, however, the defendant telephoned Ventura and admitted that he had purchased a morning after pill and a pregnancy test for the complainant. The defendant's credit card statement, a Walgreens electronic report and its surveillance photographs confirmed that the defendant had made the subject purchases at 10:02 a.m. on May 9, 2009. The defendant explained to Ventura that he had not been truthful when

Ventura was questioning him because he was embarrassed that the complainant was having unprotected sex with boys.[4]

On June 1, 2009, a social worker from the Yale Child Sexual Abuse Clinic, Theresa Montelli, conducted a forensic interview of the complainant. Although the complainant told Montelli that no one other than the defendant had ever touched her sexually, she testified at trial that she had had sex with two boys.[5]

In early June, 2009, a pediatric nurse practitioner, Janet Murphy, conducted a physical examination of the complainant. According to Murphy, the complainant's vaginal examination was normal, which was not dispositive of whether the complainant had had sexual intercourse. The complainant's blood and urine tests, however, indicated that she was pregnant. Within days of Murphy's examination, the complainant had a miscarriage while she was at school. Although medical tests were inconclusive as to who had impregnated her,[6] Beth Rackow, an obstetrician and gynecologist who examined the complainant on June 8, 2009, testified that the complainant's pregnancy was consistent with her having had sexual intercourse and become pregnant on May 9, 2009, notwithstanding the negative May 12, 2009 pregnancy test. Given the timing of the complainant's

[4] At various times, the defendant identified a number of boys with whom he claimed the complainant had had sexual intercourse. None of the boys identified by the defendant confirmed his claims.

[5] At trial, Montelli testified that it was not surprising that the complainant did not disclose to her that she had had sexual intercourse with two boys. According to Montelli, the disclosure of sexual abuse often is delayed and is a gradual process affected by many factors, such as the complainant's age, the extent of emotional support provided, the opportunity to tell, the relationship to the abuser, and whether the abuser ever made threats.

[6] According to Murphy, there was no fetal material in the debris she was able to recover from the complainant. The complainant bled prior to being taken to the hospital.

menstrual cycle and her hormone levels, the complainant could not have become pregnant during the Memorial Day holiday.

In mid-June, 2009, department social workers Anamaris Colon and Gant met with the defendant to inform him that the department was considering placing the complainant with one of her maternal aunts, either Elka or Mercedes, in New York. The defendant objected to placing the complainant with her maternal aunts on a number of grounds, claiming that they would not be good supervisors. He asserted that, when the complainant had visited her aunts during the Memorial Day weekend, she had run away for fourteen hours and had sex with a boy named Jonathan. The complainant, Mercedes, and the New York equivalent of the department denied that the complainant had run away for fourteen hours. The defendant reported to Colon and Gant that the complainant "was pretty much loose with the boys" and that she had accused him of sexual assault because she was afraid that he would punish her. He also reported that the complainant had posted an image of her face and a penis on her social network website. The complainant provided Colon with access to the website, but Colon was unable to locate the alleged image during an extended search.

Later that day, after Colon and Gant had met with the defendant, Ventura and Detective Sean Houlihan were notified by the Bridges Community Center that the defendant had expressed suicidal ideation. The officers went to the defendant's home and observed him in an agitated and tearful state. The defendant stated that he was upset because the department was attempting to place the complainant with her maternal aunts in New York. Moreover, the defendant stated that he was angry with Elka, and told a hotline worker that he wanted to harm Elka as he blamed her for the fact that he was

losing his daughter. When the police asked the defendant if he was suicidal, he stated that if he killed himself, "everything would get better." He became emotional. The officers arranged for an emergency commitment, and the defendant was taken to a hospital.

The defendant was arrested in January, 2010, and charged with various crimes. A jury trial was held in May, 2011. Given the lack of direct evidence, the complainant's credibility was a principal issue at trial.[7] The evidence focused not only on her allegations against the defendant, but also on when and with whom she had had sexual relations. The defendant attempted to impeach the complainant's credibility by highlighting inconsistencies between her trial testimony and her out-of-court statements.[8] The jury found the defendant guilty of all charges. The court sentenced the defendant to thirty years in prison followed by twenty years of special parole.

On appeal,[9] the defendant claims that he should be granted a new trial due to a pattern of prosecutorial impropriety that occurred during closing argument. More specifically, the defendant claims that the prosecutorial impropriety appealed to the emotions of the

---

[7] The defendant did not testify at trial.

[8] In contrast to her statement to Montelli that no one but the defendant had ever touched her sexually, at trial, the complainant testified that she had sex with M and H in late 2008. M testified consistently with the complainant's testimony about their relationship.

Also at trial, the complainant testified during the morning that she did not know who had impregnated her; but during the afternoon, she testified that the defendant had impregnated her. The complainant explained that she misspoke during her morning testimony due to nervousness.

[9] In the alternative, the defendant asked this court to grant him a new trial pursuant to our supervisory authority; see Practice Book § 60-2; in light of an ongoing pattern of impropriety on Pepper's part. See *State* v. *Payne*, 260 Conn. 446, 797 A.2d 1088 (2002); see also *State* v. *Ceballos*, 266 Conn. 364, 832 A.2d 14 (2003); *State* v. *Lacks*, 58 Conn. App. 412, 755 A.2d 254, cert. denied, 254 Conn. 919, 759 A.2d 1026 (2000). We decline the invitation to exercise our supervisory authority in this case.

jury by soliciting the jury's sympathy for the complainant and inciting its anger toward him thereby infringing on his sixth amendment right to confront his accuser and to present a defense at a public trial. The defendant further claims that the prosecutor improperly conveyed to the jury his personal opinion as to the defendant's credibility and guilt and commented on facts not in evidence. We agree that the prosecutor's remarks infringed on the defendant's sixth amendment rights and deprived him of a fair trial.

## I

## THE PROSECUTOR'S FINAL ARGUMENT

To support his claim of prosecutorial impropriety, the defendant has identified several portions of the prosecutor's final and rebuttal arguments that he claims were improper. After laying out the evidence, the prosecutor stated that since the day the complainant confided in her guidance counselor, the complainant "has been in foster care, but that didn't end the trauma, ladies and gentlemen. She was interviewed by strangers. She was poked and prodded by doctors and nurses. She had a miscarriage. And she had to *relive the whole experience here, facing you and the defendant, and telling you what happened to her over the period of four years.* And she had to recite to you who she had sex with and who she hasn't, because of *what that man did to her and said about her during the investigation* of this case. *I had to ask her* . . . did you ever post a photograph of yourself on the web with a penis in your face. I had to ask her that question in front of strangers, because of *what that man said and did to her.*" (Emphasis added.)

The prosecutor also stated that Murphy from the Yale sexual abuse clinic "told you about the other tests she [administered] when she heard about the history here. The [sexually transmitted disease] test, and, of course,

the pregnancy test. She said the first pregnancy test we got was positive. . . . We got to administer that again. *It's shocking for people in the medical profession.* So they—they administered a second pregnancy test, which was again positive." (Emphasis added.)

Later the prosecutor argued that "the state introduced what [the defendant] had to say at . . . various times to various investigators in this case, over the months of this case, because those details were put in front of you, not because I'm asking you to believe them, I'm asking you to see how unbelievable his protestations of innocence were. And two, those statements by the defendant were introduced—those conversations were introduced to show you how fantastic and I would submit *slanderous* and improbable the things he said about [the complainant]. And I would submit everything he said about [the complainant] over the ensuing months was rebutted. And I would submit, ladies and gentlemen, that the defendant, once the jig was up, once he was told that [the complainant] had come forward . . . he started on this campaign of disinformation. Let's play the [department] workers against the cops. Let's tell a story about [the complainant] when she was in New York." (Emphasis added.)

The defendant also has identified the following portions of the prosecutor's rebuttal argument as constituting impropriety. The prosecutor stated in part: "[R]emember that conversation the defendant had with Ventura back on July 1? And the defendant shows up with those discharge papers from [the mental health clinic] and said here's the proof that [the complainant] has some mental issues. I would submit, ladies and gentlemen, the defendant was caught in another whopper by his own witness. I asked . . . Nogelo, was [the complainant] psychotic. Was she schizophrenic? Was she bipolar? Did she have any kind of mental illnesses that would call into question her credibility? And what

did . . . Nogelo tell you? She said, 'no.' She was ten years old at the time. She was taken by her father to a strange country. She didn't understand the English language. She has some anxiety over some assimilation issues. She wasn't crazy as the defendant wanted to point out to Ventura. I submit, every crazy, outlandish claim the defendant made about his daughter over that period of time was rebutted. *Every time he slandered her*, we find out it's not true. Why? Why this campaign of disinformation against his daughter? Well, I submit, ladies and gentlemen, *what would you expect from someone who molests a twelve year old, even your own daughter?* I submit, ladies and gentlemen, he was trying to deceive and deflect the investigation of this case from the very beginning." (Emphasis added.)

## II

## STANDARD OF REVIEW

The defendant claims that the prosecutor engaged in impropriety during his final argument. Our review of the transcript discloses that defense counsel failed to object to any portion of the prosecutor's argument that the defendant claims on appeal was improper. Our Supreme Court has "stated that a defendant who fails to preserve claims of prosecutorial misconduct need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) . . . ." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 360, 897 A.2d 569 (2006). "The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial . . . ." *State* v. *Stevenson*, 269 Conn. 563, 573, 849 A.2d 626 (2004).

"Prosecutorial impropriety can occur . . . in the course of closing or rebuttal argument." (Internal quotation marks omitted.) *State* v. *Sherman*, 127 Conn. App.

377, 399, 13 A.3d 1138 (2011). "It is well settled that unpreserved claims that prosecutorial impropriety deprived a defendant of a fair trial are reviewed in two separate steps, the first of which is to ascertain whether impropriety occurred in the first instance, and the second of which is to determine whether that impropriety deprived the defendant of his due process right to a fair trial." *State* v. *Tomas D.*, 296 Conn. 476, 511, 995 A.2d 583 (2010). "In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007).

To determine "whether any improper conduct by the [prosecutor] violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams* [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that misconduct was objected to at trial." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 362. These factors include "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 34.

"[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also, that, considered in the light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012).

"[I]f the defendant raises a claim that the prosecutorial improprieties infringed a specifically enumerated constitutional right, such as the fifth amendment right to remain silent or the sixth amendment right to confront one's accusers, and the defendant meets his burden of establishing the constitutional violation, the burden is then on the state to prove that the impropriety was harmless beyond a reasonable doubt." Id., 563. "This allocation of the burden of proof is appropriate because, when a defendant raises a general due process claim, there can be no constitutional violation in the absence of harm to the defendant caused by denial of his right to a fair trial. The constitutional analysis and the harm analysis in such cases are one and the same." Id., 563–64.

## III

## PROSECUTORIAL IMPROPRIETY

## A

### Analysis of the Claimed Impropriety

In keeping with the applicable standard of review, we first determine whether prosecutorial impropriety occurred during final argument. We conclude that it did.

The defendant claims that the prosecutor's argument that the complainant was poked and prodded by doctors and nurses, had to face the defendant and the jury, had to testify at trial about personal matters was an improper appeal for sympathy for the complainant. He further claims that the prosecutor incited juror anger toward him by blaming him for the complainant having to testify about personal matters due to the things the defendant did to her. We agree that the prosecutor's argument constituted an improper appeal to the emotions of the jury and diverted its attention from the facts of the case. Any argument about the complainant being required to testify infringed on the defendant's

enumerated constitutional right to confront the witnesses against him at a public trial. Moreover, the defendant did not call the complainant to testify; the state did.

The defendant posits that an argument of the nature at issue violates the A.B.A Standards for Criminal Justice: The Prosecution Function (3d Ed. 1993), standard 3-5.8 (c), (d), which provides: "The prosecutor should not make arguments calculated to appeal to the prejudices of the jury. . . . The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence." See also *State* v. *Williams*, supra, 204 Conn. 545. Moreover, "[w]hen the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Internal quotation marks omitted.) Id., 546.

The prosecutor's argument focused on the hardships the complainant had to endure subsequent to the time she disclosed the defendant's alleged sexual abuse: she was placed in foster care, endured physical examinations and medical tests, including a pregnancy test, and suffered a miscarriage. The prosecutor did not limit his remarks to hardships to the complainant's physical well-being. He also argued that the complainant had to come into court to face the defendant and to testify to the jury about highly personal matters because of the things the defendant did to her. In other words, not only did the prosecutor seek to invoke sympathy for the complainant and anger toward the defendant, but he also opined that the defendant was guilty of having committed the crimes with which he was charged.

More significantly, the prosecutor blamed the defendant for the fact that the complainant had to testify at trial, a direct assault on the defendant's enumerated

constitutional rights. "The right to confrontation is fundamental to a fair trial under both the federal and state constitutions. . . . It is expressly protected by the sixth and fourteenth amendments to the United States Constitution . . . . The right of *physical* confrontation is a . . . fundamental component of the [federal and state confrontation] clauses . . . and guarantees an accused the right to be present in the courtroom at every stage of his trial. . . .

"Like cross-examination, face-to-face confrontation [at trial] . . . ensure[s] the integrity of the factfinding process . . . because [i]t is always more difficult to tell a lie about a person to his face than behind his back. . . . Thus, [i]t is widely recognized that physical confrontation contributes significantly, albeit intangibly, to the truth-seeking process . . . . In addition, physical confrontation furthers other goals of our criminal justice system, in that it reflects respect for the defendant's innocence until proven guilty." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Cassidy*, 236 Conn. 112, 122–23, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), overruled in part on other grounds by *State* v. *Alexander*, 254 Conn. 290, 295–96, 755 A.2d 868 (2000).

"It is well settled that a violation of constitutional magnitude may be established even though there has not been a complete abridgement or deprivation of the right. A constitutional violation may result, therefore, when a constitutional right has been impermissibly burdened or impaired by virtue of state action that unnecessarily chills or penalizes the free exercise of the right." Id., 126. "Inviting the fact finder to draw an inference adverse to a defendant solely on account of the defendant's assertion of a constitutional right impermissibly burdens the free exercise of that right and, therefore, may not be tolerated." Id., 127. The prosecutor twice

blamed the defendant for the hardships the complainant had to endure because of what he "did to her." By arguing the hardships faced by the complainant given what the defendant did to her and said about her and the questions the state "had to ask her," the prosecutor invited the jury to draw inferences adverse to the defendant on the basis of his exercise of his constitutional rights to confront the witnesses against him at a public trial.[10]

The prosecutor's statement that he "had to ask" the complainant certain questions, improperly denigrated the defendant's right to require the state to prove its case beyond a reasonable doubt. See, e.g., State v. Coleman, 52 Conn. App. 466, 469, 727 A.2d 246 (to convict defendant of sexual assault in first degree state must prove beyond reasonable doubt defendant compelled victim to engage in sexual intercourse by use of force or threat of force), cert. denied, 249 Conn. 902, 732 A.2d 776 (1999).

The defendant claims that it was improper for the prosecutor to argue that he took the complainant to a mental health clinic "because she's having some anxiety

---

[10] In concluding that the prosecutor's arguments were improper, we do not minimize the hardships and challenges faced by the complainant, which we acknowledge were considerable. While the substance of an argument concerning the effect a crime had on the victim may be appropriate during the sentencing phase of a trial, it is simply inappropriate for a prosecutor to suggest to the jury that the defendant should be punished for exercising his right to confront his accuser at a public trial. As the Texas Court of Appeals stated: "The right to a jury trial is guaranteed under the Sixth and Fourteenth Amendments. [A defendant] had every right to invoke his Sixth Amendment right to jury trial and his right to confront the witnesses against him. A penalty cannot be imposed for the exercise of a constitutional right. See Spevack v. Klein, 385 U.S. 511, 515, 87 S. Ct. 625, 17 L. Ed. 2d 574 (1967)." Villareal v. State, 860 S.W.2d 647, 649 (Tex. App. 1993); see also State v. McNeil, 658 N.W.2d 228, 235 (Minn. App.) (misconduct for prosecutor to attack defendant for exercising his right to fair trial and encourage jury to punish him for what prosecutor perceives as further victimization of victim), review denied, 2003 Minn. LEXIS 378 (Minn. June 25, 2003).

getting assimilated to his country at ten years old or so, and then you try to use it against her" because it not only sought to evoke sympathy for the complainant but also ire toward the defendant. He also claims that it was improper for the prosecutor to argue that the defendant had "undertaken a campaign of disinformation" about the complainant.

"The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies." (Internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 634, 1 A.3d 1051 (2010).

Although we fully agree that the defendant had a constitutional right to present a defense, we conclude that the "campaign of disinformation" argument was predicated on the evidence presented at trial. Statements the defendant made at certain points during the investigation regarding the complainant's need for mental health counseling, his purchasing the morning after pill and a pregnancy test, his representations about the complainant's activities during her Memorial Day visit to New York City, and an image on the complainant's social webpage were rebutted at a later time. A prosecutor properly may argue that a defendant had a motive to lie. The argument regarding a campaign of disinformation, therefore, was grounded in the evidence and the reasonable inferences to be drawn from it.

The defendant also claimed that the prosecutor's use of words such as "whopper" was improper. We conclude that the use of such terms constituted hyperbole, which was not improper given their context. "When making closing arguments to the jury . . . [c]ounsel must be allowed a generous latitude in argument, as

the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 553, 78 A.3d 828 (2013).[11]

The prosecutor violated the defendant's constitutional rights by expressing his personal opinion concerning the defendant's guilt. Twice during final argument the prosecutor stated, with respect to the complainant, "what that man did to her" and, at the end of his rebuttal argument, "what would you expect from someone who molests a twelve year old, even your own daughter." We find this argument particularly egregious as it not only appealed to the emotions of the jury but also had nothing to do with the evidence. In effect, the prosecutor was telling the jury that the defendant was a despicable person. This is not argument; it is invective.

"[A] prosecutor may not express [his] own opinion, either directly or indirectly, as to the credibility of a witness or *the guilt of the defendant.* . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony. . . . These expressions of opinion are particularly difficult for the jury to ignore because of the special position held by the prosecutor." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 304–305, 755 A.2d 868 (2000); see also A.B.A. Standards for Criminal Justice, supra, standard 3-5.8 (b) (prosecutor should not express personal opinion as to guilt of accused). Here, the prosecutor implied on three separate occasions that the defendant was guilty, which is improper argument.

The defendant also cites one instance in which the prosecutor improperly argued facts not in evidence.

[11] The defendant also takes exception to the prosecutor's argument that he "slandered" the complainant. We disfavor the use of the word "slander"

The prosecutor argued that the health professional examining and evaluating the complainant were "shocked" that they twice had to administer a pregnancy test to the complainant. There was no evidence as to the health professionals' reaction to administering pregnancy tests to the complainant. A prosecutor may argue the state's case forcefully, provided it is based on the facts in evidence and the reasonable inferences to be drawn from that evidence. See *State* v. *Luster*, 279 Conn. 414, 428–29, 902 A.2d 636 (2006). The argument that the health care professionals were shocked that they had to administer a pregnancy test to the complainant twice, therefore, was improper.

The defendant also claims that, during the state's rebuttal argument, the prosecutor improperly commented on the defendant's failure to call a witness in violation of *State* v. *Malave*, 250 Conn. 722, 737 A.2d 442 (1999), cert. denied, 529 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000). Our review of the transcripts of the oral arguments of both the prosecutor and defense counsel demonstrates that defense counsel clearly invited the prosecutor's comments with regard to the claimed missing witness.[12] The prosecutor's remarks in that regard, therefore, were not improper. "The state may properly respond to inferences raised by the defendant's closing argument." *State* v. *Singh*, 259 Conn. 693, 717, 793 A.2d 226 (2002).

in final argument but, in this case, the prosecutor's use of the word again was hyperbole.

[12] During his final argument, defense counsel referred to the fact that the state had failed to call one of the complainant's girlfriends to testify about a sleepover party that supposedly took place at the girl's home on May 8-9, 2009. Defense counsel stated in part: "But no one came in here and got on the stand and said there wasn't a sleepover. . . . The only one that says that didn't happen, of course, is the complaining witness." The prosecutor responded to the argument by setting out the evidence and then arguing that the defense called a second girl to testify about a conversation concerning a sleepover at the girlfriend's house, but the girlfriend "was never called. If she slept over [at the girlfriend's] house, why didn't we hear from" her? The record discloses that each side argued that the other had failed to call a witness.

In sum, we conclude that several statements made by the prosecutor constituted impropriety and that some of those comments infringed on the defendant's rights enumerated in the sixth and fourteenth amendments to the constitution of the United States and article first, § 8, of the constitution of Connecticut.

B

Due Process Analysis

It is accepted that prosecutorial impropriety can occur during final or rebuttal argument. See *State* v. *Sherman*, supra, 127 Conn. App. 399. "To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing the significance of an instance of prosecutorial impropriety, a reviewing court must consider the entire context of the trial, and [t]he question of whether the defendant has been prejudiced by prosecutorial [impropriety] . . . depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citation omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 37, 975 A.2d 660 (2009).

Having determined that certain statements made by the prosecutor during his final and rebuttal arguments were improper, we must decide whether the defendant was deprived of his due process right to a fair trial. Pursuant to *State* v. *Williams*, supra, 204 Conn. 540, "we consider: (1) the extent to which the [impropriety] was invited by defense conduct or argument; (2) the severity of the [impropriety]; (3) the frequency of the [impropriety]; (4) the centrality of the [impropriety] to the critical issues in the case; (5) the strength of the

curative measures adopted; and (6) the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 287, 973 A.2d 1207 (2009). On the basis of the *Williams* analysis, we must determine whether the jury's verdict would have been different. We acknowledge what common sense requires, i.e., that this analysis is to some extent inherently speculative. Here, the prosecutorial impropriety was severe and infringed on the defendant's sixth and fourteenth amendment rights to confront his accuser and to present a defense at trial. When prosecutorial impropriety violates enumerated constitutional rights, the state bears the burden of demonstrating that the error was harmless beyond a reasonable doubt. See *State* v. *Payne*, supra, 303 Conn. 563.

On the basis of our review of the record and the arguments of the parties, we conclude that none of the conduct we have found to constitute prosecutorial impropriety was invited by the defense. The improprieties were limited to the prosecutor's final argument, particularly rebuttal argument. We conclude that several instances of impropriety were severe because they infringed on the defendant's sixth and fourteenth amendment rights to present a defense, to confront his accuser, and to a public trial. The improprieties were central to the case because there was no corroborating proof that the defendant had sexually assaulted the complainant or that he was, in fact, responsible for her pregnancy. Only the complainant testified to that effect. The defense theory was that the complainant accused the defendant of sexual assault because the defendant was disciplining the complainant, his daughter, for having sex with boys. The credibility of the complainant was central to the case, and the defendant was entitled to discredit her. Although there was considerable circumstantial evidence of the defendant's sexual abuse, it was not corroborated by independent evidence. The

state's case, therefore, was neither weak nor particularly strong. Despite several instances of prosecutorial impropriety, we again observe that defense counsel failed to object to the improprieties and the court offered no curative instruction beyond the standard instruction that the arguments of counsel are not evidence, nor was it asked to do so.[13] In conclusion, we find that the defendant has demonstrated that prosecutorial impropriety that occurred during final argument denied him the due process right to a fair trial.

C

Analysis of Harm

The prosecutorial impropriety in this case violated several of the defendant's enumerated constitutional rights, more specifically, the right to present a defense and the right to confrontation at trial. When a prosecutor's argument impermissibly infringes on a defendant's rights guaranteed under the federal and state confrontation clauses, "he is entitled to a new trial on those counts unless the state can establish that the objectionable comments were harmless beyond a reasonable doubt." *State* v. *Cassidy*, supra, 236 Conn. 129.

As in *Cassidy*, the defendant and the complainant were the only individuals with firsthand knowledge of the pertinent events. See id. The state's case rested on the testimony of the complainant, which was not corroborated in any material respect. The jury's task was to determine whether the complainant's testimony

---

[13] Defense counsel's failure to object is significant. We remind defense counsel of our Supreme Court's prior admonition. "We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument . . . when [it was] made suggests that defense counsel did not believe that [it was ] unfair in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 597, 849 A.2d 626 (2004).

was credible. The defendant did not testify, but evidence was presented that throughout the investigation of the complainant's allegations of sexual assault on the part of the defendant, the defendant sought to deny the allegations and explained to the police and department personnel that the complainant had accused him in retaliation for his objection to her sexual relations with boys.

Having applied the *Williams* factors to the case at hand, we conclude that: (1) the prosecutor's argument was not invited by the defense; (2) the improprieties were limited to final argument, including rebuttal, but included some of the last words the jury heard from the state; (3) the impropriety regarding what the defendant did to the complainant was central to the critical issue in the case, which is whether the defendant sexually abused the complainant; (4) the state's case was only moderately strong in that there was no corroborating evidence of the defendant's alleged sexual assaults although the state presented circumstantial evidence, including constancy of accusation evidence, that supported the complainant's accusation; (5) because defense counsel failed to object to the prosecutor's impropriety, the court took no curative measures; and (6) although defense counsel apparently did not perceive that the prosecutor's argument warranted objection, we conclude that the improprieties were severe.

"The right to confrontation is fundamental to a fair trial under both the federal and state constitutions. . . . It is expressly protected by the sixth and fourteenth amendments to the United States constitution . . . . and by article first, § 8, of the Connecticut constitution. . . . The right of *physical* confrontation is a . . . fundamental component of the [federal and state confrontation] clauses . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Cassidy*, supra, 236 Conn. 122.

"[I]t is widely recognized that physical confrontation contributes significantly, albeit intangibly, to the truth-seeking process . . . . In addition, physical confrontation furthers other goals of our criminal justice system, in that it reflects respect for the defendant's dignity and the presumption of innocence until proven guilty. . . . Indeed, the literal right to confront one's accusers is so deeply rooted in human feelings of what is necessary for fairness [that] the right of confrontation contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails. . . . Because of the important goals furthered by an accused's right to encounter adverse witnesses face-to-face, the free exercise of that right may not be impaired absent a compelling justification for the infringement." (Citations omitted; internal quotation marks omitted.) Id., 123.

To summarize, in this case, the prosecutor not only made an emotional appeal to the jury to evoke sympathy for what the complainant endured at the defendant's hand, but also implied that the defendant was at fault for compelling her to suffer the indignity of testifying at trial. The prosecutor argued that he "had to ask" the complainant certain embarrassing questions ignoring the fact that the state had to bear the burden of proof that the defendant was guilty as charged beyond a reasonable doubt. "Inviting the fact finder to draw an inference adverse to a defendant solely on account of the defendant's assertion of a constitutional right impermissibly burdens the free exercise of that right and, therefore, may not be tolerated." Id., 127. Because the prosecutor argued that the complainant had to endure the hardship of coming to court to testify because of what the defendant had done to her, he "invited the jury to draw an inference adverse to the defendant solely because of the defendant's exercise of his constitutional right to confront the [complainant]." Id., 127–28.

We conclude that the state has failed to demonstrate beyond a reasonable doubt that the prosecutor's improper argument that infringed on several of the defendant's enumerated constitutional rights was not likely to influence the jury's verdict. We conclude that the prosecutor crossed a line he must not cross and deprived the defendant of a fair trial. The defendant, therefore, is entitled to a new trial.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.