### STATE OF CONNECTICUT *v.* CLEVELAND HAASE
### (SC 15408)

Borden, Berdon, Katz, Palmer and McDonald, Js.

Argued October 3—officially released December 2, 1997

*M. Donald Cardwell*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Joan K. Alexander*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury convicted the defendant, Cleveland Haase, of murder in violation of General Statutes § 53a-54a[1] and tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1).[2] On appeal from the judgment of conviction of the trial court, sentencing him to a total effective prison term of forty

---

[1] General Statutes § 53a-54a provides in relevant part: "Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception . . . ."

[2] General Statutes § 53a-155 provides in relevant part: "Tampering with or fabricating physical evidence: Class D felony. (a) A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding . . . ."

years,[3] the defendant claims that: (1) statements made by the assistant state's attorney during her closing argument to the jury infringed upon his constitutionally protected right to refrain from testifying; and (2) the trial court improperly prohibited the defendant from introducing testimony regarding certain statements allegedly made by the victim shortly before her death. Because we conclude that these claims are without merit, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In March, 1995, the defendant resided on the first floor of a two story house located at 98 West Euclid Street in Hartford. Charles Black, who owned the building, lived on the second floor of that residence. Black first met the victim, Jamesette Carter, in the summer of 1994. The victim had approached Black as he was exiting a bank and told him that she was hungry and needed money. Black gave the victim $5 and his address. Subsequent to this initial encounter, the victim made several visits to Black's residence, seeking money. On a number of these occasions, Black, at the victim's suggestion, paid the victim to have sex with him. On other occasions when the victim solicited money from Black at his residence, he told her that he did not have any money, and she left without incident.

At approximately 8 to 8:30 p.m. on March 30, 1995, the victim stopped by Black's residence. Black observed that the victim possessed a folding knife. At Black's request, the victim gave Black the knife, which he

---

[3] The defendant has appealed directly to this court pursuant to General Statutes (Rev. to 1997) § 51-199 (b), which provided in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years. . . ." Section 51-199 (b) has since been amended by Public Acts 1997, No. 97-178, § 2.

placed on a table. The victim asked Black for money, and Black gave her approximately $2. While they were speaking, Black heard the defendant arrive and enter his first floor residence. At approximately 9 p.m., the victim took her knife and departed Black's residence. Soon thereafter, Black heard people conversing in the defendant's residence, but he could not hear what they were saying. Black then fell asleep.

Some time later, Black was awakened by the defendant, who was calling his name and asking that Black come downstairs. Black did so, and the defendant told Black that he had shot the victim when she attempted to rob him. The defendant also asked Black to telephone an ambulance, which he did. After making the emergency call, Black went upstairs to put on his shoes. When he returned to the downstairs residence, the defendant was not there. The police and medical personnel arrived at the defendant's residence and found the victim, unconscious, on the floor of the defendant's bedroom. The victim was taken to the hospital, where she died several days later from a gunshot wound to the cervical spine caused by a bullet that had been fired from a distance of approximately six inches from her neck.[4]

The police executed a search warrant at the defendant's residence on the night of the shooting. An empty .380 caliber shell casing was found on the defendant's bed, but no guns or bullets were found in the residence. The victim's shirt and pants, which had been removed by an emergency medical technician, were seized from the defendant's bedroom floor. Coins and a folding knife, which was closed, were found in the victim's pants pocket. There were no signs of a struggle.

---

[4] According to testimony from the state's medical expert, the gunshot wound suffered by the victim would have caused her immediately to lose all purposeful movement.

Later that night, the defendant telephoned Black and asked him if the police were looking for the defendant. Black told the defendant that the police had contacted him in an effort to ascertain the defendant's whereabouts. Black informed the police of the defendant's call.

After an arrest warrant had been issued for the defendant, the defendant's attorney contacted the police to inform them that the defendant planned to surrender himself voluntarily, which he did on April 3, 1995. That day, the defendant gave the police a written statement regarding the shooting incident, which was introduced into evidence by the state without objection by the defendant. In his statement, the defendant explained that he was in bed sometime after 9 p.m. on March 30, 1995, when he heard a noise and looked up to see someone picking through articles in his dresser. The defendant attempted to get out of bed to confront the unknown intruder when the intruder pushed him back down onto his bed. While on his bed, the defendant reached for his PPK Walther .380 caliber handgun and fired it once in the direction of the intruder, who was standing next to his bed.

According to his statement, the defendant then got dressed, told Black what had occurred, and drove to the Bissell Bridge, where he threw the gun into the Connecticut River.[5] He next proceeded to the Hartford residence of his uncle, Stanley Hawes, with whom he left his car and car keys. Thereafter, the defendant took a bus to New York, where he remained until returning to Connecticut several days later.

On October 10, 1995, the defendant gave a second statement regarding the shooting, this time to an investigator hired by his attorney. In this statement, which the state also introduced into evidence without objection by

---

[5] Despite efforts by the police to locate the gun, it never was found.

the defendant, the defendant, for the first time, indicated that the victim was carrying a knife. He also described his alleged struggle with the victim in greater detail. A criminalist from the state forensic laboratory testified, however, that it was unlikely that the shooting occurred in a manner consistent with the description of the incident given by the defendant in either his April or his October statement. Additional facts will be set forth as necessary.

## I

The defendant first claims that he is entitled to a new trial because the assistant state's attorney, during her closing argument to the jury, improperly commented on his failure to testify. We disagree.

The following facts are relevant to this issue. At trial, the defendant claimed that he had shot the victim in self-defense. See General Statutes § 53a-19. The defendant, however, exercised his right not to testify, relying instead on his April 3, 1995 and October 10, 1995 statements to establish his claim of self-defense.

In its rebuttal argument to the jury, the state sought to contradict defense counsel's assertions, also made during closing argument, that the defendant had substantially cooperated with the police investigation of the shooting. Specifically, the assistant state's attorney stated: "[The defendant] had to cooperate. He knew, the next day, from Mr. Black, that the police were looking for him. He knew he had to come up with a defense, [be]cause he knew he was the shooter. So, he turned himself in instead of living a life on the run, instead of looking over [his] shoulder. And he started cooperating, because the best defense is a good offense. But, when you make up a defense, this defense of an intruder, you get caught . . . . It doesn't make sense that [the victim] is an intruder that needed to be killed. [Her] coat's off, her shoes [are] off. And there's certainly nothing in

the evidence that shows she was using deadly physical force against [the defendant]. Cooperation? You've got nothing to hide. Well, the one thing [the defendant] did hide is the reason why." The defendant immediately objected to the statement that "the one thing [the defendant] did hide is the reason why" he shot the victim, claiming that such argument constituted improper comment on the defendant's failure to testify about his reason for shooting the victim.[6] The trial court overruled the defendant's objection.

Thereafter, the assistant state's attorney focused her argument on an inconsistency between the defendant's April 3, 1995 statement to the police, and the testimony of Hawes, the defendant's uncle. In his statement, the defendant indicated that he had left his car and car keys with Hawes on the evening of the shooting, immediately after disposing of the gun that he had used to shoot the victim. At trial, however, Hawes, testifying for the state, asserted that the defendant did not drop off his car and keys with Hawes until the following morning. In her rebuttal argument, the assistant state's attorney highlighted this inconsistency, stating: "[The defendant] can't even tell you the truth about leaving the car. If you look at [his April 3, 1995] statement . . . [it] says: 'I left the scene immediately.' Which we know is 9:53 [p.m. on the evening of the shooting] when the call came in to the 9-1-1 [emergency line]. 'I went to the Bissell Bridge. I dropped off the car and went to New York.' [Then Hawes] comes in [to testify]. [When does] he get the car? Seven thirty in the morning. This man will not tell us what happened." The defendant objected to the assistant state's attorney's comment that the

[6] Although the defendant failed expressly to identify his right to refrain from testifying as the basis of his objection to the assistant state's attorney's argument, the state does not contest the defendant's assertion that the nature of the objection was sufficiently clear to focus the trial court's attention on that issue. For purposes of this appeal, therefore, we accept the defendant's characterization of the objection.

defendant "will not tell us what happened," claiming that such argument constituted impermissible comment by the state on his failure to testify. The trial court overruled the objection,[7] but noted: "There's [a] very thin line there. . . . I would just ask [the assistant state's attorney] to be conscious of that line."[8]

Finally, at the conclusion of her rebuttal argument, the assistant state's attorney challenged the veracity of the two statements relied upon by the defendant in support of his claim of self-defense: "[The defendant] may regret it now. He may come up with the explanations of April 3 and October 10. His excuses. But, at that moment, at 98 West Euclid Street, there was one thought when that gun was at [the victim's] neck. And that was to kill. It's senseless. I don't know what the motive [was]. I can't tell you that. Two people had the opportunity to tell us, [be]cause there [were] only two people there. See the explanations given by the defendant. And [the victim] is not giving you an explanation. The evidence provides no justification. No deadly force that justifies this killing. And I'd ask you to find the defendant guilty of murder. . . . Thank you." The defendant immediately moved for a mistrial on the ground that the assistant state's attorney's statement highlighting the fact that the defendant had not provided the jury with a valid explanation for the shooting, along

[7] Although the trial court did not formally rule on the defendant's objection, the court did not sustain the objection, thereby allowing the assistant state's attorney's comment to stand.

[8] Immediately after the trial court had overruled the defendant's objection, the assistant state's attorney made the following statement to the jury: "I want to make one thing clear, and what's objected to. [The defendant] doesn't have to get on the stand and tell his side of the story. Every person who comes into the court, and I respect this, has the right to sit there and remain silent. But, [the defendant] hasn't remained silent, to the extent [that] he has given two statements, which he's incorporated as his own. And in both of those statements he does not tell accurate facts. He can't even tell us when the car was dropped off. Because he tells [the police] at night; and [Hawes] tells me it's in the morning."

with the other argument to which the defendant previously had objected, violated his constitutional right to remain silent. The trial court denied the defendant's motion, concluding that the assistant state's attorney's references, reasonably construed, pertained to the defendant's two pretrial statements and not to his failure to testify. The trial court also indicated that its charge to the jury regarding the defendant's right to refrain from testifying would eliminate any possible reason for concern that the assistant state's attorney's comments might be viewed by the jury as a comment on the defendant's failure to testify.[9]

Before addressing each of the defendant's three claims of prosecutorial impropriety, we review the legal principles that govern our analysis. "It is well settled that comment by the prosecuting attorney . . . on the defendant's failure to testify is prohibited by the fifth amendment to the United States constitution. *Griffin* v. *California,* 380 U.S. 609, 615, 85 S. Ct. 1229, 14 L. Ed. 2d 106, reh. denied, 381 U.S. 957, 85 S. Ct. 1797, 14 L. Ed. 2d 730 (1965)." *State* v. *Arline,* 223 Conn. 52, 66, 612 A.2d 755 (1992). Our legislature has given statutory recognition to this right by virtue of its enactment of

[9] The defendant sought an immediate curative instruction. The trial court, however, rejected the defendant's request. Later, though, the court, in its charge to the jury, gave the following instruction: "Now, [the defendant] has not taken the stand in this particular case. An accused person has the option to testify or not to testify at his trial. He's under no obligation to testify. He has an absolute constitutional right not to testify. You must not draw any unfavorable inferences from the defendant's failure to testify.

"Now, there were some comments today in the [assistant] state's attorney's argument—closing argument to you. And there was a—a[n] objection by [defense counsel], which was proper. The . . . argument . . . of the [assistant] state's attorney is . . . towards the documents in evidence. The argument was to the two pieces in evidence, the two statements in evidence.

"Now, the [assistant] state's attorney did not mean to infer, nor imply in any way, and comment in any way, on the defendant's failure to testify. Again, you must not draw any unfavorable inferences from the defendant's failure to testify."

General Statutes § 54-84.[10] "In determining whether a prosecutor's comments have encroached upon a defendant's right to remain silent, we ask: Was the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" (Internal quotation marks omitted.) *State* v. *Marra*, 222 Conn. 506, 533, 610 A.2d 1113 (1992); see *State* v. *Negron*, 221 Conn. 315, 325, 603 A.2d 1138 (1992). Further, in applying this test, we must "look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury." (Internal quotation marks omitted.) *Hall* v. *Wainwright*, 733 F.2d 766, 773 (11th Cir. 1984), cert. denied, 471 U.S. 1107, 105 S. Ct. 2344, 85 L. Ed. 2d 858 (1985); see *United States* v. *Robinson*, 485 U.S. 25, 33, 108 S. Ct. 864, 99 L. Ed. 2d 23 (1988); *State* v. *Oliveras*, 210 Conn. 751, 762–63, 557 A.2d 534 (1989). Finally, "[w]e also recognize that the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Magnotti*, 198 Conn. 209, 220, 502 A.2d 404 (1985); *State* v. *Ubaldi*, 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

The defendant concedes that the assistant state's attorney had the right to comment on the two voluntary pretrial statements made by the defendant and upon

[10] General Statutes § 54-84 provides in relevant part: "Testimony or silence of accused. (a) Any person on trial for crime . . . at his or her option may testify or refuse to testify upon such trial. The neglect or refusal of an accused party to testify shall not be commented upon by the court or prosecuting official, except as provided in subsection (b) of this section.

"(b) Unless the accused requests otherwise, the court shall instruct the jury that they may draw no unfavorable inferences from the accused's failure to testify. . . ."

which he relied to establish his claim of self-defense. The defendant claims, instead, that the assistant state's attorney's three allegedly objectionable comments naturally and necessarily focused the jury's attention on the defendant's failure to testify. We disagree.

The defendant first challenges the assistant state's attorney's comment that "the one thing [the defendant] did hide is the reason why," claiming that the statement carries an implication that the defendant had a duty to testify or otherwise to provide additional information regarding his claim of self-defense. When viewed in isolation, the assistant state's attorney's comment arguably is susceptible of the meaning that the defendant ascribes to it. When considered in context, however, it is apparent that the statement constitutes a fair response to the defendant's argument regarding his cooperation with the police.

Immediately before making the challenged statement, the assistant state's attorney sought to explain to the jury why the defendant had little choice but to cooperate. In this context, the assistant state's attorney next suggested that the defendant, although appearing to be cooperative, had used his cooperation as an opportunity to fabricate a claim of self-defense. The assistant state's attorney then indicated that "the one thing [the defendant] did hide is the reason why" he had shot and killed the victim. Because the defendant's cooperation consisted, in large part, of providing the information contained in his two voluntary statements, it is most reasonable to construe the assistant state's attorney's comment not as an indirect reference to the defendant's failure to testify but, rather, as a direct challenge to the credibility of the defendant's two statements. As we previously have stated, a defendant, "by his failure to testify, cannot insulate himself from general comment on the weakness of his case, even though his failure so to testify may be perceived by the jury as having

contributed to the general weakness about which comment is made." *State* v. *Magnotti*, supra, 198 Conn. 220. We therefore reject the defendant's contention that the assistant state's attorney's comment naturally and necessarily was interpreted by the jury to be a reference to the defendant's failure to testify.

The defendant next challenges the assistant state's attorney's statement that "[the defendant] will not tell us what happened." The defendant contends that this comment was a reference to his failure to testify and necessarily was interpreted as such by the jury. We, however, decline to give the challenged statement the broad reading, severed from its context, urged by the defendant. Rather, we are persuaded that this comment, when viewed in the context of the trial evidence and the relevant portions of the assistant state's attorney's argument, directed the jury's attention to a discrepancy between certain information that the defendant had provided to the police, on the one hand, and the testimony of his uncle, Hawes, on the other.

The assistant state's attorney made the statement in connection with her assertion that the defendant could not "even tell [the jury] the truth about leaving [his] car." Specifically, the assistant state's attorney contrasted the defendant's April 3, 1995 assertion that he had given Hawes his car on the evening of the shooting, with Hawes' trial testimony that the defendant had delivered the car to Hawes on the morning after the shooting. It is apparent, therefore, that the assistant state's attorney, by emphasizing the disparity between the defendant's out-of-court statement and Hawes' testimony, sought to cast doubt on the truthfulness of the defendant's statement rather than to focus the jury's attention on his failure to testify.

We note that, as suggested by the trial court, the language used by the assistant state's attorney to highlight this discrepancy skirted the boundaries of permissible argument. We are mindful, however, that "closing

arguments of counsel, are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. While these general observations in no way justify prosecutorial misconduct, they do suggest that a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 646–47, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); see also *State* v. *Marra*, supra, 222 Conn. 533–34. We note, moreover, that the assistant state's attorney issued a prompt response to the defendant's objection, informing the jury in clear and unequivocal terms that, in fact, she had been referring only to the defendant's voluntary statements and not to his failure to take the stand. See footnote 8 of this opinion. We conclude, therefore, that the jury naturally and necessarily would not have interpreted the assistant state's attorney's statement as a comment on the defendant's failure to testify.

The defendant also challenges the assistant state's attorney's remarks that "[t]wo people had the opportunity to tell us, [be]cause there [were] only two people there" and "[the victim] is not giving you an explanation." The defendant claims that these comments violated his right to remain silent because they suggested to the jury that the defendant bore the burden of explaining why he had shot the victim. Contrary to the defendant's contention, however, these remarks were made in the context of the assistant state's attorney's argument challenging the veracity of the defendant's two voluntary statements. Indeed, the assistant state's attorney, during the very portion of her argument to which the defendant has objected, made express reference to the defendant's statements, first directing the jury's attention to his "explanations of April 3 and October 10 . . . [h]is excuses," and, once again, to "the

explanations given by the defendant." Thus, the clear purpose of the challenged argument was to direct the jury's attention to the alleged weakness of the defendant's version of the incident as set forth in his out-of-court statements. Accordingly, we agree with the state that the challenged comments, when considered in context, constitute fair comment on the credibility of the defendant's claim of self-defense as proffered through his voluntary statements.

Finally, we are satisfied that any conceivable risk of jury confusion over the meaning of the three statements in question was eliminated by the trial court's instructions. See footnote 9 of this opinion. Specifically, the court informed the jury that the defendant was "under no obligation to testify" and that "[h]e has an absolute constitutional right not to testify." In addition, the trial court twice admonished the jury that it "must not draw any unfavorable inferences from the defendant's failure to testify." Finally, the trial court expressly and repeatedly instructed the jury that the challenged comments of the assistant state's attorney related to the defendant's two voluntary statements and not to the defendant's failure to testify. The defendant has presented no persuasive reason why, in the circumstances of this case, it is likely that the jury failed to adhere to those instructions. See *State* v. *Prioleau*, 235 Conn. 274, 315, 664 A.2d 743 (1995); *State* v. *Jennings*, 216 Conn. 647, 664, 583 A.2d 915 (1990). Accordingly, we reject the defendant's claim that he is entitled to a new trial based upon the assistant state's attorney's allegedly improper closing argument.

## II

The defendant next claims that the trial court improperly prohibited him from introducing testimony regarding certain statements that the victim had made shortly before her death. We disagree.

The following facts are necessary to our determination of this issue. At trial, the defendant sought to offer

the testimony of George Henry, who resided next door to the defendant. During the defendant's offer of proof outside the presence of the jury, Henry testified that the victim had come to his home on the day of the shooting to visit an acquaintance who was cleaning Henry's residence. According to Henry, the victim told him "that she was going next door to . . . get some money [from Black]."[11] Although Henry responded that Black "hasn't got any money," the victim stated that she "always get[s] money from him" and proceeded toward Black's residence.

In response to the state's objection to the introduction of this evidence, defense counsel contended that Henry's testimony was admissible, apparently because it tended to establish the victim's intention to go to Black's residence for the purpose of soliciting money from him.[12] The trial court sustained the state's objection without elaboration.

Under the state of mind exception to the hearsay rule, a declarant's statement may be admitted as circumstantial evidence that the declarant carried out his or her intention. *State* v. *Santangelo*, 205 Conn. 578, 592, 534 A.2d 1175 (1987); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.13.3, p. 381. A trial court, however, retains discretion to exclude evidence that is merely cumulative. See, e.g., *State* v. *Porter*, 241 Conn. 57, 87, 698 A.2d 739 (1997); *State* v. *Watley*, 195 Conn. 485, 490, 488 A.2d 1245 (1985); *State* v. *Gooch*, 186 Conn.

---

[11] Henry and the victim referred to Black, who was seventy years old at the time of the trial, as "the old man." It is not disputed that their references to "the old man" were to Black.

[12] The state contends that the defendant failed to explain adequately why Henry's proffered testimony was admissible and, therefore, that we should not review his claim on appeal. Because it is apparent that the trial court did not abuse its discretion in precluding the proffered testimony, we need not decide the threshold issue raised by the state. Accordingly, for purposes of this appeal, we assume without deciding that the defendant properly preserved his claim regarding the admissibility of Henry's testimony.

17, 24, 438 A.2d 867 (1982). The state presented uncontradicted and uncontested testimony from Black himself that the victim had visited him on the evening of the shooting for the purpose of soliciting money from him and that he had given her $2. In light of this uncontroverted evidence, Henry's testimony regarding the victim's intention to travel to Black's residence to request money would have added nothing to the defendant's case. Because the proffered evidence clearly was cumulative, the trial court was well within its discretion in excluding it.

The judgment is affirmed.

In this opinion the other justices concurred.