******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* FELIX R.*
(SC 19278)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and Robinson, Js.

*Argued March 19—officially released October 6, 2015*

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Michael A. Pepper*, senior assistant state's attorney, for the appellant (state).

*Stacey Van Malden*, pro hac vice, with whom, on the brief, was *Robert C. Ross*, for the appellee (defendant).

*Opinion*

ESPINOSA, J. The sole issue in this certified appeal is whether the Appellate Court properly concluded that the prosecutor had deprived the defendant of his due process right to a fair trial by engaging in prosecutorial impropriety during closing argument. The state appeals, following our grant of certification, from the judgment of the Appellate Court reversing the judgment of the trial court convicting the defendant, Felix R., of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), two counts of sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (2), one count of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (E), and three counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). The state claims that the Appellate Court improperly determined that prosecutorial improprieties occurred and that those improprieties deprived the defendant of a fair trial.[1] We conclude that the majority of the challenged remarks were not improper. As to the remaining remark, although the state has conceded that it was improper, we conclude that that comment did not deprive the defendant of a fair trial and, accordingly, we reverse the judgment of the Appellate Court.

The Appellate Court set forth the following relevant facts, which the jury reasonably could have found. "The [victim], the defendant's daughter, was born in the Dominican Republic to parents who never married one another. The defendant moved to the United States, and the [victim] continued to live with her mother in the Dominican Republic until 2005 when she moved to the United States to live with the defendant and her paternal grandmother. At the time she came to the United States, [the victim] was ten years old and spoke no English. . . .

"The defendant began to touch the [victim] in a sexual manner approximately three months after she arrived in Connecticut. On occasion the defendant tried to kiss her and have her touch his penis. In 2006, the defendant took the [victim] to a [child guidance] clinic because she wept frequently, was having difficulty sleeping, and was anxious. When she was seen at the clinic, the [victim] did not mention the defendant's sexual advances toward her because the defendant had threatened to hurt her if she told anyone about it. . . .

"The [victim] attempted to tell her mother about the defendant's sexual advances by writing her a letter. She asked the defendant to deliver the letter when he traveled to the Dominican Republic. The [victim] does not know whether her mother ever received the letter. In late 2007 or early 2008, the [victim] and the defendant together visited the Dominican Republic. During their visit, the [victim] told her paternal aunt that the defen-

dant abused her. The paternal aunt confronted the defendant, who denied the accusations of abuse. . . . In late 2008, the [victim's] maternal aunt, Mercedes, asked the [victim] about a letter in which the [victim] had stated that she did not want to live with the defendant and threatened to commit suicide. The [victim] told Mercedes that the contents of the letter were untrue. In March, 2009, a representative of the Department of Children and Families (department) visited the [victim] at her school. When the representative from the department asked the [victim] whether she was being sexually abused, the [victim] gave a negative response. The [victim] later stated that she was afraid to tell anyone about the defendant's sexual advances because she was fearful; the defendant was sometimes aggressive. The [victim] did not know who had contacted the department about her situation.

"On the morning of May 9, 2009, when the [victim] was fourteen, the defendant awakened her by touching her breasts. The defendant held the [victim's] hands above her head and took off her pajamas. The [victim] asked the defendant to stop, but he covered her mouth, told her to shut up, and forced her to engage in sexual intercourse. The defendant used a condom, but it broke. The [victim] saw 'white stuff' in the broken condom and on her body. The defendant instructed the [victim] not to tell anyone what had occurred. Later that morning, the defendant purchased a pregnancy test and Plan B (morning after pill). He directed the [victim] to take one of the morning after pills and gave her a second pill approximately twelve hours later. On May 12, 2009, the defendant gave the [victim] a pregnancy test, which produced a negative result. . . .

"On . . . May 28, 2009, the defendant touched the [victim] while she was sleeping. The [victim] awakened, pushed the defendant away, and slapped him. The defendant left the [victim] alone but warned her not to tell anyone or he would do something to her.

"The [victim] went to school and reported the defendant's sexual abuse to her guidance counselor. She told her guidance counselor that the defendant had touched her breasts that morning and had done so many times previously. She also told him that the defendant had penetrated her and threatened to send her back to the Dominican Republic if she told anyone about it. Moreover, the [victim] also stated that she was afraid to go home from school. The guidance counselor telephoned the department hotline to report what the [victim] had told him. . . . The department placed the [victim] in foster care that day.

"Later, on the evening of May 28, 2009, department personnel informed the defendant of the [victim's] accusations and that she was being removed from his home. The defendant denied having abused the [victim]. . . . He claimed that the [victim] was angry with him for

having confronted her about [a] boy. He acknowledged, however, that during the previous year, the [victim's] mother had accused him of having sexually abused the [victim].

"Detective John Ventura [of the Wallingford Police Department] interviewed the defendant. The defendant told Ventura that, on a couple of occasions, he had taken the [victim] to the hospital for an evaluation because he thought she was having sex with a boy. The defendant claimed that the hospital had refused to see the [victim] on those occasions for 'ethical reasons.' The defendant also informed Ventura that the [victim] slept in his bed because she was not getting along with her paternal grandmother, and that he saw nothing wrong with the [victim] sleeping with him. When Ventura asked the defendant if he had purchased a pregnancy test for the [victim], the defendant became excited and extremely nervous. He denied having purchased a pregnancy test and claimed that the [victim] had used his credit card without telling him why. He also denied that he had bought the [victim] a morning after pill.

"The following day, however, the defendant telephoned Ventura and admitted that he had purchased a morning after pill and a pregnancy test for the [victim]. The defendant's credit card statement, a Walgreens electronic report and its surveillance photographs confirmed that the defendant had made the subject purchases at 10:02 a.m. on May 9, 2009. The defendant explained to Ventura that he had not been truthful when Ventura was questioning him because he was embarrassed that the [victim] was having unprotected sex with boys.

"On June 1, 2009, a social worker from the Yale Child Sexual Abuse Clinic, Theresa Montelli, conducted a forensic interview of the [victim]. Although the [victim] told Montelli that no one other than the defendant had ever touched her sexually, she testified at trial that she had had sex with two boys.

"In early June, 2009, a pediatric nurse practitioner, Janet Murphy, conducted a physical examination of the [victim]. According to Murphy, the [victim's] vaginal examination was normal, which was not dispositive of whether the [victim] had had sexual intercourse. The [victim's] blood and urine tests, however, indicated she was pregnant. Within days of Murphy's examination, the [victim] had a miscarriage while she was at school. Although medical tests were inconclusive as to who had impregnated her, Beth Rackow, an obstetrician and gynecologist who examined the [victim] on June 8, 2009, testified that the [victim's] pregnancy was consistent with her having had sexual intercourse and become pregnant on May 9, 2009, notwithstanding the negative May 12, 2009 pregnancy test. . . .

"In mid-June, 2009, department social workers Ana-

maris Colon and [Tira] Gant met with the defendant to inform him that the department was considering placing the [victim] with one of her maternal aunts, either Elka or Mercedes, in New York. The defendant objected to placing the [victim] with her maternal aunts . . . claiming that they would not be good supervisors. He asserted that, when the [victim] had visited her aunts during the Memorial Day weekend, she had run away for fourteen hours and had sex with a boy named Jonathan. The [victim], Mercedes, and the New York equivalent of the department denied that the [victim] had run away for fourteen hours. The defendant reported to Colon and Gant that the [victim] 'was pretty much loose with the boys' and that she had accused him of sexual assault because she was afraid that he would punish her. He also reported that the [victim] had posted an image of her face and a penis on her social network website. The [victim] provided Colon with access to the website, but Colon was unable to locate the alleged image during an extended search. . . .

"The defendant was arrested in January, 2010, and charged with various crimes. A jury trial was held in May, 2011. Given the lack of direct evidence, the [victim's] credibility was a principal issue at trial. The evidence focused not only on her allegations against the defendant, but also on when and with whom she had had sexual relations. The defendant attempted to impeach the [victim's] credibility by highlighting inconsistencies between her trial testimony and her out-of-court statements. The jury found the defendant guilty of all charges." (Footnotes omitted.) *State* v. *Felix R.*, 147 Conn. App. 206, 208–15, 83 A.3d 619 (2013). The defendant appealed from the judgment of conviction to the Appellate Court, claiming that the prosecutor's statements during closing argument violated his right to a fair trial. Id., 208. The Appellate Court reversed the defendant's conviction and remanded the case for a new trial. Id., 232. This certified appeal followed.

We first set forth the general principles under which we review claims of prosecutorial impropriety. "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." *State* v. *Payne*, 303 Conn. 538, 562–63, 34 A.3d 370 (2012). In analyzing whether the prosecutor's comments deprived the defendant of a fair trial, we generally "determine, first, whether the [prosecutor] committed any impropriety and, second, whether the impropriety or improprieties deprived the defendant of a fair trial." *State* v. *Fauci*, 282 Conn. 23, 35, 917 A.2d 978 (2007).

I

We first consider whether the prosecutor's statements were improper. We recognize that "[impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361–62, 897 A.2d 569 (2006). When reviewing the propriety of a prosecutor's statements, "we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 45. Finally, when a prosecutor's potentially improper remarks are ambiguous, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations. *Donnelly* v. *DeChristoforo*, 416 U.S. 637, 646–47, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974) . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Haase*, 243 Conn. 324, 336, 702 A.2d 1187 (1997), cert. denied, 523 U.S. 1111, 118 S. Ct. 1685, 140 L. Ed. 2d 822 (1998).

The defendant argues that the prosecutor's statements during closing argument fall into four distinct categories of impropriety: (1) appeals to the emotions of the jurors; (2) commentary on the defendant's exercise of his right to confrontation under the sixth and fourteenth amendments to the United States constitution; (3) expressions of personal opinion as to the defendant's guilt and the credibility of witnesses; and (4) reference to a fact not introduced into evidence. We will examine each category of alleged impropriety in turn.

First, the defendant argues that the prosecutor made emotional appeals to the jury in order to evoke sympathy for the victim and to raise ire against the defendant. An appeal to emotions "improperly diverts the jury's attention away from the facts and makes it more difficult for it to decide the case on the evidence in the record." *State* v. *Alexander*, 254 Conn. 290, 307, 755 A.2d 868 (2000). An appeal to emotions invites the jury to instead reach a decision based on "powerful and irrelevant factors . . . ." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 719, 793 A.2d 226 (2002). The defendant focuses on a particular group of statements wherein the prosecutor recounted the difficulties that the victim faced during the investigation and trial. The prosecutor stated to the jury that the victim "was interviewed by strangers . . . was poked and prodded by doctors . . . had a miscarriage . . . had to relive the whole experience here" and "had to recite to you who she had sex with and who she hasn't . . . ."

Although in isolation these statements could under

certain circumstances be construed as fanning the flames of emotion, when put into the context of the entire trial and closing argument, the incendiary potential of the statements is extinguished. The prosecutor was reiterating the state's principal theory—that the victim would not have willingly chosen to undergo such difficulties if she were lying. We have recognized this line of argument as acceptable in previous cases. *State* v. *Warholic*, supra, 278 Conn. 365–66 (proper for prosecutor to argue that minor complainant would not have gone through testifying unless telling truth); *State* v. *Burton*, 258 Conn. 153, 170, 778 A.2d 955 (2001) (proper for state to argue that witness lacked motive to lie). Furthermore, all of the victim's travails were already familiar to the jury, who had heard them described exhaustively in testimony from social workers, medical professionals, and the victim herself. Although the underlying crime was, by its nature, inherently charged with emotion, the prosecutor did not invite the jurors to disregard the facts of the case in favor of their emotions. Rather, the state was summarizing evidence that supported its theory of the case. Therefore, the prosecutor's comments were not improper in this regard.

Second, the defendant argues that the prosecutor invited the jury to draw adverse inferences from the defendant's exercise of his sixth and fourteenth amendment confrontation clause rights. A prosecutor may not "invite the jury to draw an inference of guilt solely based on the defendant's exercise of his constitutional right to be present at trial and confront . . . witness[es]." *State* v. *Alexander*, supra, 254 Conn. 299. The defendant focuses on the prosecutor's remarks that the victim "*had* to relive the whole experience here, facing [the jury] and the defendant, and telling [the jury] what happened to her . . . [a]nd she *had* to recite to you who she had sex with and who she hasn't . . . *I had to ask her* . . . did you ever post a photograph of yourself on the web with a penis in your face? *I had to ask her that question in front of strangers, because of what that man said and did to her.*" (Emphasis added.) These statements immediately followed the prosecutor's remarks listing the difficulties that the victim faced during the investigation. The defendant construes these remarks as an impermissible comment on his enumerated right to confront the witnesses against him at a public trial. According to the defendant, in light of the fact that the state called the victim as a witness, the prosecutor's refrain that the victim "had" to relive her abuse through testifying was a comment on the defendant's right to proceed to trial and confront witnesses.

Conversely, the state contends that the prosecutor's statements were not in reference to the defendant's constitutional rights, but, rather, a guileless articulation of the state's overarching dual theory of the case: that the victim had no motive to lie and gained no benefit in reporting the abuse and that the defendant had a

strong motive to lie and deceive investigators. Indeed, the entirety of the closing argument is peppered with iterations of this theme. The prosecutor repeatedly asked the jury, "what motive does [the victim] have to come in here and sit there and say my father sexually abused me . . . ?" He even concluded the state's argument by requesting that the jurors ask themselves one question: "Why would [the victim] get up on the stand and say what she did?" Thus, in context, it is ambiguous as to whether the prosecutor was referring to the defendant's confrontation rights or to the state's need to demonstrate the credibility of the victim and the falsity of the defendant's statements. An impartial reading of the remarks reveals that both interpretations are plausible.

In our prior decisions addressing alleged prosecutorial impropriety, we have stated that a prosecutor's ambiguous remarks will not be ascribed their most damaging interpretation in the minds of the jurors. See, e.g., *State* v. *Ciullo*, 314 Conn. 28, 48, 100 A.3d 779 (2014); *State* v. *Warholic*, supra, 278 Conn. 368; *State* v. *Haase*, supra, 243 Conn. 335–36; *State* v. *Marra*, 222 Conn. 506, 533–34, 610 A.2d 1113 (1992). Consistent with that principle, we recognize that "[c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument." (Internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 553, 78 A.3d 828 (2013).

We accept the state's suggestion, proposed at oral argument before this court, that it would be helpful for us to clarify the meaning of "ambiguous" in the context of prosecutorial impropriety. To draw from the realm of statutory interpretation, language is deemed ambiguous "when read in context, [it] is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *State* v. *Buckland*, 313 Conn. 205, 224, 96 A.3d 1163 (2014), cert. denied,      U.S.    , 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015).[2] To be clear, in furtherance of our policy of not assigning ambiguous remarks their most damaging interpretation from an array of less damaging interpretations, in those cases where a prosecutor's allegedly improper statements are genuinely ambiguous, the ambiguity will be construed in favor of the state. Put another way, for the purpose of determining whether a challenged remark is improper, when selecting among multiple, plausible interpretations of the language, this court will assign the remark the less damaging, plausible meaning. Accordingly, because the prosecutor's comment that the victim "had" to testify "because of what that man said and did to her" is ambiguous, we read the remark to refer, albeit imprecisely, to the state's overarching theme: the victim had no motive to lie and the defendant did. The remarks, therefore, were not improper.

Third, the defendant alleges that the prosecutor improperly provided his personal opinion as to the defendant's credibility and guilt. It is a fundamental principle that "a prosecutor may not express [his or] her own opinion, either directly or indirectly, as to the credibility of a witness or the guilt of the defendant." *State* v. *Alexander*, supra, 254 Conn. 304. A prosecutor may, however, argue that a witness testified credibly or had a motive to lie "if such an argument is based on reasonable inferences drawn from the evidence." *State* v. *Warholic*, supra, 278 Conn. 365. Additionally, "the prosecutor may argue for the reasonable inferences that the jury may draw from the evidence adduced at trial, including the defendant's commission of the crime." Id., 367.

The defendant focuses on the following remarks of the prosecutor as evidence that the prosecutor opined on his guilt and credibility: "[E]very crazy, outlandish claim the defendant made about his daughter over that period of time was rebutted. *Every time he slandered her, we find out it's not true. Why? Why this campaign of disinformation against his daughter? Well, I submit, ladies and gentlemen, what would you expect from someone who molests a twelve year old, even your own daughter?* I submit, ladies and gentlemen, he was trying to deceive and deflect the investigation of this case from the very beginning." (Emphasis added.) The defendant also alleges that the prosecutor's earlier remark that the victim had to testify "because of what that man said and did to her" improperly opined upon his guilt.

Again, we are faced with vying, reasonable interpretations of the prosecutor's remarks. The defendant reads the remarks as the prosecutor informing the jury that he believed the defendant to be guilty and unreliable, whereas the state asserts that the remarks reiterated the prosecution's theory that the defendant had a motive to lie during the investigation given the nature of the charges against him, as a defendant accused of sexually assaulting his own daughter would not be expected to freely admit such an act. The state itself acknowledges that the prosecutor's words were imprecise and that they are ambiguous as to whether the prosecutor was referring to what the defendant did during the investigation or to his guilt in the underlying crimes. Indeed, the prosecutor's phrase "someone who molests" suggests guilt in a way that a phrase such as "someone *accused* of molesting" does not. Conversely, the same comment may be read as the prosecutor inviting the jury to draw an inference as to the defendant's guilt and credibility based on the evidence at trial, particularly the contradicted and uncorroborated statements he made to investigators. Due to the multiple reasonable interpretations of the remarks, we construe the ambiguity in favor of the state. The prosecutor's remarks, therefore, were not improper. We emphasize that our decisions that

have construed ambiguous language in favor of the state do not establish a bright line rule. The impropriety of a prosecutor's remarks is a fact centered inquiry, which must be determined on a case-by-case basis. For instance, at a certain point, the sheer number of ambiguous statements that have a possibly improper meaning made by a prosecutor during the course of a trial deprive the state of the presumption that such remarks are the result of inartfulness and instead demonstrate a pattern of impropriety. The record in the present case does not demonstrate such a pattern.

Fourth, the defendant argues that the prosecutor improperly referred to a fact not introduced into evidence. We recognize that "[s]tatements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." *State* v. *Ceballos*, 266 Conn. 364, 400, 832 A.2d 14 (2003). While summarizing the testimony of Murphy, the pediatric nurse practitioner who examined the victim, the prosecutor stated: "[Murphy] said the first pregnancy test we got was positive. . . . We got to administer this again. *It's shocking for people in the medical profession.* . . . [T]hey administered a second pregnancy test, which was again positive." (Emphasis added.) The state concedes that this comment referred to a fact not in evidence and, indeed, nothing in Murphy's testimony suggests that the pregnancy test results were shocking. Accordingly, the comment was improper and we will review it as such.

II

We must now determine whether the prosecutor's statement that the results of the victim's pregnancy test were "shocking for people in the medical profession" deprived the defendant of his due process right to a fair trial. In conducting our inquiry, rather than analyzing individual statements in isolation, we ask "whether the trial as a whole was fundamentally unfair and [whether] the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Internal quotation marks omitted.) *State* v. *Ceballos*, supra, 266 Conn. 408. In determining whether prosecutorial improprieties violated the defendant's due process rights, we examine six factors: "[1] the extent to which the [impropriety] was invited by defense conduct or argument . . . [2] the severity of the [impropriety] . . . [3] the frequency of the [impropriety] . . . [4] the centrality of the [impropriety] to the critical issues in the case . . . [5] the strength of the curative measures adopted . . . and [6] the strength of the state's case." (Citations omitted.) *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). We examine each factor in turn and conclude that the prosecutor's statement in the present case did not impermissibly infringe on the defendant's due process rights such that he was deprived of a fair trial.

First, the prosecutor's statement was not invited by any of defense counsel's conduct or statements at trial. At no point in the trial did the defense call into question Murphy's testimony about the pregnancy test or provide the prosecutor with any other grounds for his comment. Second, the prosecutor's improper statement was not severe. When evaluating the severity of the impropriety, "we take into consideration whether defense counsel objected to any of the improper remarks, requested curative instructions, or moved for a mistrial." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 398. Significantly, defense counsel failed to object to the impropriety at trial and we therefore presume that counsel did not consider the impropriety severe enough to merit an objection. Third, the prosecutor's impropriety was not frequent. Improper statements that are "minor and isolated" will generally not taint the overall fairness of an entire trial. *State* v. *Payne*, supra, 303 Conn. 565; id., 567 (defendant's due process rights not violated when prosecutor's improper remarks were brief and confined to closing argument). In the present case, the prosecutor's improper statement was a single statement buried in a lengthy closing argument and was not repeated. See *State* v. *Maguire*, supra, 310 Conn. 556 (improprieties were frequent when prosecutor's "disparaging refrain" was "repeated over and over for dramatic effect"); *State* v. *Williams*, supra, 204 Conn. 546–47 (prosecutor repeatedly described defendant with pejorative language). Fourth, the improper statement was not central to the critical issues of the case. To resolve the case, the jury was required to make a determination regarding the victim's credibility, rather than the accuracy of the pregnancy tests or medical procedures employed by the various medical personnel who testified. Fifth, the trial court's general jury instruction was sufficiently curative. We recognize that general jury instructions can cure the potential effects of minor prosecutorial improprieties. See *State* v. *Payne*, supra, 303 Conn. 567–68; *State* v. *Haase*, supra, 243 Conn. 337. In such cases, "we presume the jury . . . followed [the court's instruction] in the absence of any indication to the contrary." *State* v. *Collins*, 299 Conn. 567, 590, 10 A.3d 1005, cert. denied, U.S. , 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). In the present case, the trial court specifically instructed the jury to disregard "conclusions of facts which have not been produced in evidence." As that instruction addresses the very impropriety alleged here, and there is no indication that the jury did not adhere to it, we conclude that it was sufficiently curative.

Finally, we analyze the strength of the state's case. See *State* v. *Williams*, supra, 204 Conn. 540. In sexual abuse cases, while "the absence of conclusive physical evidence of sexual abuse does not automatically render [the state's] case weak, that same absence surely does not strengthen the state's case . . . ." *State* v. *Ceballos*,

supra, 266 Conn. 416. The sexual abuse of children is a crime which, by its very nature, occurs under a cloak of secrecy and darkness. It is not surprising, therefore, for there to be a lack of corroborating physical evidence in cases that are factually similar to the present case, where the victim submitted to the sexual abuse of her father in the face of his threats to physically harm her and send her back to the Dominican Republic if she told anyone. Given the rarity of physical evidence in these circumstances, a case is not automatically weak just because a child's will was overborne and he or she submitted to the abuse of his or her own parent. To conclude otherwise would place an insurmountable obstacle in the path of many sexual assault prosecutions.

We therefore conclude that the state's case was not weak due to the lack of conclusive physical evidence corroborating sexual assault, especially given the corroborating evidence introduced at trial. Much of the corroborating evidence that the state presented at trial was untarnished by the prosecutor's improper remark. For example, the prosecutor's comment did not reference the defendant's purchase of a pregnancy test and morning after pills, the corroborating testimony of the social workers and police that handled and investigated the victim's case, or the testimony of the victim herself, all of which was likely persuasive to the jury. The jury was in the best position to evaluate the victim's credibility against the credibility of the defendant's pretrial statements to investigators and the jury ultimately found the victim's testimony credible, despite the lack of corroborating physical evidence.

In sum, we conclude that the defendant was not deprived of his due process right to a fair trial. Though the prosecutor's improper remark was uninvited by the defense, the severity of the improper comment was minimal, confined to closing argument, did not bear on a central issue in the case, and was rectified by the trial court's general instructions to the jury. Accordingly, we do not find it likely that the prosecutor's brief remark would have convinced an entire panel of jurors to disregard their sworn duty and return a verdict founded on impermissible inferences rather than the weight of the evidence before them.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to render judgment affirming the judgment of the trial court.

In this opinion ROGERS, C. J., and ZARELLA, EVELEIGH and ROBINSON, Js., concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual assault and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] We granted the state's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly reverse the judgment

against the defendant based upon prosecutorial improprieties?" *State* v. *Felix R.*, 311 Conn. 915, 84 A.3d 883 (2014).

[2] The legal definition of "ambiguous" that courts employ when conducting statutory interpretation is, with minor variations, equivalent to its colloquial definition. See, e.g., The Random House Dictionary of the English Language (2d Ed. 1987) p. 64 ("open to or having several possible meanings or interpretations"); The American Heritage Dictionary of the English Language (5th Ed. 2011) p. 56 ("[o]pen to more than one interpretation"); Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 39 ("capable of being understood in two or more possible senses or ways"); The Oxford English Dictionary (2d Ed. 1989) p. 386 ("[a]dmitting more than one interpretation, or explanation; of double meaning, or of several possible meanings"). Although the definition we use here is legal both in its origin and use, that definition of "ambiguous" reflects a common understanding of the meaning of the word.

--------------------------------