******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

D'AURIA, J., dissenting. I agree with much of the majority opinion. For starters, I agree that the prosecutor's use of the phrase "nuts and sluts" improperly appealed to the jurors' emotions, diverted their attention from the evidence presented at trial, and distorted the state's burden of proof. I agree, too, that the prosecutor improperly injected her own personal experiences into the case by listing four general defenses that she claimed defendants "generally" rely on in criminal cases, and two additional defenses that defendants "usually" raise in sexual assault cases in particular, although I question the majority's assertion that jurors understood from the prosecutor's use of those words that this list was not exhaustive. See footnote 3 of this opinion. In any case, I agree that none of these defenses aligned with the actual defense raised by the defendant, Casey Liem Sullivan: that the state's witnesses were not credible and that the state therefore had not proven its case beyond a reasonable doubt. I also agree with a great deal of the majority's harm analysis, which it bases on the considerations that this court articulated in *State* v. *Williams*, 204 Conn. 523, 540–41, 529 A.2d 653 (1987).

I disagree, however, with the majority's conclusion that the prosecutorial improprieties in this case did not deprive the defendant of a fair trial and, therefore, with its affirmance of the defendant's conviction of unlawful restraint in the second degree, sexual assault in the fourth degree, attempt to commit sexual assault in the third degree, and sexual assault in the third degree. More specifically, I part ways with the majority when it concludes that the same improprieties, which it acknowledges were "gratuitous and inflammatory," did not deprive the defendant of a fair trial because they were isolated, not objected to, and followed what the majority considers to be a "relatively strong" evidentiary case presented by the state. In my view, the majori-

ty's harm analysis discounts significantly the prejudicial impact of the prosecutor's improper remarks. Given the particular circumstances of this case—in which the improprieties were among the final words that the jury heard from the parties, were neither responsive to, nor invited by, any of the defendant's arguments, and were central to the determinative issue of credibility—I believe that the prosecutor's improper remarks prejudiced the defendant's right to a fair trial by diverting the jury's attention from his defense and denigrating that defense to the level of a sexist colloquialism. Accordingly, I respectfully dissent. I would reverse the Appellate Court's judgment and remand the case for a new trial.

The prosecutorial improprieties in this short, three day trial occurred during the prosecutor's rebuttal summation, in the crucial moments of closing argument that mark the last time that jurors will hear directly from the parties. The crux of the prosecutor's argument was that the defendant had sexually assaulted the alleged victim, C, while she was staying in the defendant's house visiting her mother, the defendant's tenant. The defendant denied this allegation, arguing that C and her mother lied as part of a scheme to protect the mother from having to pay the defendant rent. Although the prosecutor began her summation rebuttal appropriately, she soon veered into improper territory by listing for the jury four defenses that defendants "usually" pose in criminal cases: "It's alibi; somebody else did it; I did [it], [but] I was justified; or I did it, [but] I was out of my mind." She went on to describe, in crass terms that the state on appeal does not condone, two defenses that she claimed defendants typically raise in sexual assault cases: "it's generally nuts and sluts . . . ." Quite apparently recounting her experience prosecuting other sexual assault claims, she explained to the jury, "[e]ither the victim has had other, you know, situations that

you're not gonna believe that she wasn't consenting, or she's nuts. And the question is, do you think [C] is nuts? Because she'd have to be nuts to make all of this up. There's no reason for her to fabricate this, is there? What does she gain out of this?"

It is uncontested that the "prosecutor's office carries a special prestige in the eyes of the jury." *State* v. *Singh*, 259 Conn. 693, 722, 793 A.2d 226 (2002). This prestige is warranted, and the prosecutor's influence is apparent. In the courtroom, the prosecutor is the personification of the state of Connecticut, charged with enforcing this state's criminal laws pursuant to the Connecticut constitution—a status that prosecutors often wear on their sleeves before this court. See Conn. Const., amend. XXIII. Simply put, when prosecutors speak, jurors listen. With this constitutional status, however, comes an increased responsibility to avoid engaging in the types of improper arguments that the prosecutor made to the jury in the present case, which distorted the state's burden of proof and inserted her own knowledge and experience into the record. See, e.g., *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 187, 243 A.3d 1163 (2020) (" 'A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.' ").

Prosecutorial improprieties that distort the state's burden of proof may be harmful because, as the majority recognizes, they suggest that "the jury must find something other than that the state has met its burden of proving the defendant guilty beyond a reasonable doubt" to obtain a conviction. Part I B of the majority opinion; see *State* v. *Singh*, supra, 259 Conn. 709–10; see also *State* v. *Courtney G.*, 339 Conn. 328, 357–58, 360, 260 A.3d 1152 (2021). So, too, prosecutorial impro-

prieties that inject a prosecutor's own knowledge into a trial are harmful because jurors might improperly carry that knowledge into their deliberations, which constitutes "a form of unsworn and unchecked testimony [that is] particularly difficult for the jury to ignore because of the prosecutor's special position." (Internal quotation marks omitted.) *State* v. *Gibson*, 302 Conn. 653, 660, 31 A.3d 346 (2011); see also *State* v. *Gold*, 180 Conn. 619, 659, 431 A.2d 501 ("[t]he prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict" (internal quotation marks omitted)), cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980).

Precisely because of the prestige and responsibility that accompanies the prosecutor's role as a " 'minister of justice' "; *Gomez* v. *Commissioner of Correction*, supra, 336 Conn. 187; a defendant's right to a fair trial is seriously jeopardized when "a prosecutor [tells] a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such an argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 434, 902 A.2d 636 (2006). That jeopardy is even greater, and the prosecutor's argument is even more distracting and confusing to jurors, when defense counsel has *not* in fact employed the "standard tactics" that the prosecutor has listed, because the improper remarks in that case create a void between the prosecutor's " 'unsworn and unchecked testimony' "; *State* v. *Gibson*, supra, 302 Conn. 660; and the evidence properly before the jury. That disconnect can suggest to jurors that the prosecutor has access to evidence that they have not seen; see,

e.g., *State* v. *Singh*, supra, 259 Conn. 718; evidence that perhaps aligns with the prosecutor's contention that the defendant is, without the jury's knowledge, employing the same "standard tactics" described by the prosecutor, in turn increasing the potentially harmful impact of those improper remarks. See, e.g., *State* v. *Outing*, 298 Conn. 34, 85, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011); *State* v. *Fasanelli*, 163 Conn. App. 170, 183, 133 A.3d 921 (2016).

When evaluating the prejudicial impact of an impropriety, "[t]he object of inquiry before a reviewing court in [due process] . . . [is] the fairness of the entire trial, and not the specific incidents of [the improprieties] themselves." (Internal quotation marks omitted.) *State* v. *Spencer*, 275 Conn. 171, 178, 881 A.2d 209 (2005); see also *State* v. *Ciullo*, 314 Conn. 28, 36, 100 A.3d 779 (2014) (same). Several considerations gathered and detailed in this court's decision in *State* v. *Williams*, supra, 204 Conn. 540, guide this determination, including "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Hinds*, 344 Conn. 541, 563–64, 280 A.3d 446 (2022).[1] For

---

[1] The majority properly describes the nonresponsive nature of the prosecutorial improprieties in this case, and appropriately expresses skepticism of the state's argument on appeal that the prosecutor's remarks amounted to a "commonsense view of the evidence," considering that the defendant did not assert (1) an alibi defense, (2) that someone else had attacked C, (3) that he was justified in assaulting C, (4) that he was "out of [his] mind," (5) that C was insane ("nuts"), or (6) that C was promiscuous (a "slut"). (Internal quotation marks omitted.) I agree fully with the majority that the improprieties in this case were "unrelated to the evidence," and, in my view, also were in no way responsive to defense counsel's arguments at trial that the state's evidence was not credible.

example, in *State* v. *Wilson*, 308 Conn. 412, 64 A.3d 91 (2013), this court assessed the fairness of the defendant's trial in light of the specific facts involved, holding that the fact that the improprieties in that case were not central to the case's outcome was dispositive of the defendant's claim of prejudice, but that they "might well have amounted to a deprivation of due process if [the impropriety had] . . . proved material to the outcome of the trial." Id., 454. In *Williams* itself, this court remarked that the considerations that demonstrated harmfulness did so "*on the facts of* [*that*] *case* . . . ." (Emphasis added.) *State* v. *Williams*, supra, 550; see also C. Champagne, "Prosecutorial Misconduct in Connecticut: A Review," 78 Conn. B.J. 196, 228 (2004). Put differently, these considerations must guide, not hamstring, any harmfulness analysis that this court undertakes within the context of a particular set of facts.[2]

I agree with the majority that the "inflammatory nature [of these improprieties] was compounded by the fact that the prosecutor used [them] during her rebuttal closing argument . . . [when] defense counsel had no opportunity to respond." Part I A of the majority opinion; see *State* v. *Dabate*, 351 Conn. 428, 454, 331 A.3d 1159 (2025); see also *State* v. *Felix R.*, 147 Conn. App. 206, 230, 83 A.3d 619 (2013) (impropriety during rebuttal

---

[2] Like many multifactor tests, the "*Williams* factors," as they have come to be known, do not always capture all the criteria worthy of the court's consideration, or how particular criteria should be weighed in different factual circumstances. See, e.g., *State* v. *Skok*, 318 Conn. 699, 727, 122 A.3d 608 (2015) (*Zarella, J.*, concurring) ("More troubling, this court never has clarified the relative weight that should be accorded to each factor. Consequently, our decisions often have read like scorecards in which we unthinkingly have tallied how many factors supported the position of the claimant versus that of the opposing party."); *State* v. *Victor O.*, 301 Conn. 163, 174, 20 A.3d 669 ("[r]ecognizing the indefiniteness inherent in applying this multifactor approach, we observed that [t]he actual operation of each factor, as is the determination of which factors should be considered at all, depends greatly on the specific context of each case" (internal quotation marks omitted)), cert. denied, 565 U.S. 1039, 132 S. Ct. 583, 181 L. Ed. 2d 429 (2011).

summation argument was harmful because it included "some of the last words the jury heard from the state"), rev'd on other grounds, 319 Conn. 1, 124 A.3d 871 (2015). It is not difficult to imagine that, in the context of this relatively brief trial, jurors might have interpreted the prosecutor's final pitch to mean that the defendant's defense was less worthy of consideration, or suspect in some way, because, according to the prosecutor, it was not among those that defendants "usually" or "generally" pose.[3] (Internal quotation marks omitted.) See *State* v. *Maguire*, 310 Conn. 535, 561, 78 A.3d 828 (2013) (improper, uninvited remarks were "relatively severe" because they "denigrated the defense theory of the case by mischaracterizing it"). There is ample, empirical evidence suggesting that improprieties that occur at the end of a trial enhance the likelihood of prejudice due to the persuasive value of closing arguments and the recency effect.[4] *State* v. *Silva*, 339 Conn.

---

[3] Although I agree that the improprieties in this case are best understood as distorting, rather than shifting, the state's burden of proof, I am not convinced, as is the majority, that the prosecutor's use of the terms "generally" and "usually" indicate "that the list of defenses was not intended to be exhaustive or exclusive." In my view, the majority's assertion presumes the prosecutor's intent, which we cannot know with certainty based on this record and is, moreover, not relevant to whether improprieties occurred. More importantly, it presumes that the jury *understood* this supposed intent and *appreciated* that the list of defenses was not exhaustive. I credit jurors with being attentive and intelligent, but I cannot agree that they would obviously appreciate such a subtle, legal point. See, e.g., *State* v. *Rodriguez-Roman*, 297 Conn. 66, 78, 98, 3 A.3d 783 (2010) (majority determined that qualifying term "including" modified "all of the antecedent language" in statute, whereas concurrence disagreed that same qualifying term did so).

[4] See M. Bowman, "Mitigating Foul Blows," 49 Ga. L. Rev. 309, 343–44 (2015) ("[W]hen prosecutors improperly . . . appeal to jury prejudices, they may improperly shape juror narratives about the case. . . . [C]losing arguments are particularly useful for solidifying the support of jurors already inclined in one's favor and for providing ammunition for them to use in the jury room 'so that they can become an extension of the advocate.' When the prosecutor's argument is improper, jurors may still use it as ammunition. And the inherent credibility advantage that prosecutors generally enjoy may make jurors even more receptive to these arguments and may make it hard for defense counsel to counter such arguments. These types of appeals might

598, 626, 262 A.3d 113 (2021) ("[c]losing argument is an integral part of any criminal trial, for it is in this phase that the issues are sharpened and clarified for the jury and each party may present his theory of the case" (internal quotation marks omitted)). Given the recency effect and the brevity of the trial, it is also not difficult to imagine that a clever phrase like "nuts and sluts," made in a brief rebuttal and accompanied by a list of defenses "usually" asserted by defendants, might leave an oversized impression on the jury. Compare *State* v. *Dabate*, supra, 351 Conn. 464 (Four instances of prosecutorial impropriety were "not sufficiently severe or frequent to deprive the defendant of a fair trial . . . . When considered in context of the 130 witnesses and the 600 exhibits presented during the five week trial, the harm was less pronounced insofar as the improprieties occurred infrequently."). In fact, it *is*

be particularly powerful during closing arguments, as empirical research supports the common wisdom among trial advocates about the persuasive power of closing arguments on jurors. . . . [T]he 'recency effect' suggests that people tend to remember best and be influenced by the latest event in a sequence more than by earlier events. The recency effect can be exacerbated by the 'asymmetric rebound effect,' the process by which powerful information can trigger a backlash against a strongly held belief. If a defense attorney has succeeded in gaining sympathy or understanding for a defendant, and the prosecutor responds by using inflammatory language or arguments in rebuttal, the result may be an 'asymmetric rebound effect, whereby the jurors would become incensed that they were 'suckered' into believing that the defendant was deserving of sympathy and of the protections of the Bill of Rights. That research is consistent with the empirical research showing that exposure to 'anger-provoking stimuli increases the tendency to blame other people for ambiguous events and to neglect alternative explanations and possible mitigating circumstances.' For these reasons, inflammatory prosecutorial arguments may significantly prejudice the defendant's ability to receive a fair trial." (Footnotes omitted.)); see also R. Alford, "Catalyzing More Adequate Federal Habeas Review of Summation Misconduct: Persuasion Theory and the Sixth Amendment Right to an Unbiased Jury," 59 Okla. L. Rev. 479, 514 (2006) ("because of the recency effect, the closing argument has often been labeled the 'make or break' moment of the trial, and lawyers are advised by many experts and consultants to plan their entire trial strategy with the aim of constructing the optimal closing argument").

difficult to imagine that leaving a mark on the jury was not the reason for this choice of words,[5] particularly considering the length of the prosecutor's rebuttal and the influence of prosecutors on jurors as "ministers of justice." Therefore, although perhaps in some trials, a brief, uninvited, isolated, and unobjected to remark might not establish that a defendant was harmed by prosecutorial impropriety, in the context of *this case*, I conclude, contrary to the majority, that these characteristics of the improprieties suggest a "reasonable likelihood of prejudice to the defendant." *State* v. *Reynolds*, 264 Conn. 1, 174, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

I also disagree with the majority that we can conclude that the outcome of the defendant's trial was fair based on the relative strength of the state's case. Although I certainly agree that the state presented sufficient evidence to convict the defendant of sexual assault, as the majority accurately points out, that evidence was hardly overwhelming and ultimately came down to a credibility contest. See, e.g., *State* v. *Angel T.*, 292 Conn. 262, 295, 973 A.2d 1207 (2009) (prosecutorial impropriety is "significant" to harm in cases that hinge on credibility). Given C's testimony that the defendant heavily licked and kissed her neck, the strongest evidence favoring the state's theory of the case—that the defendant indeed sexually assaulted C—was that the defendant's DNA was consistent with a sample taken from C's neck. But that sample notably did not detect amylase, an enzyme found in saliva. The defendant argued that, considering that C was staying in his house at the time of the alleged attack, without detectable amylase, the DNA evidence

[5] Downplaying the significance of these remarks, the state on appeal contends that the prosecutor's comments, particularly the "nuts and sluts" remark, occurred during a "lengthy closing argument . . . ." See, e.g., *State* v. *Sullivan*, 220 Conn. App. 403, 421, 298 A.3d 1238 (2023). But the state's rebuttal was not lengthy at all, occupying just under four pages of transcript in the record.

from C's neck could have originated from clothes, furniture, artwork, or other items in the house. The state contended, on the other hand, that a test result that did not detect amylase does not mean that amylase was not present at all but, rather, that it was merely present at undetectable levels. Although perhaps the jury accepted this explanation, it is also plausible that the jury could have taken this evidence as either neutral to or detracting from the state's argument, considering that evidence suggesting the lack of saliva on C's neck did not corroborate her account of events.

The state's remaining evidence was testimonial, making the jury's ultimate determination one of credibility. The jury could have reasonably questioned the credibility of the state's witnesses, considering the inconsistencies in the testimony of C and her mother on key facts. For example, C's mother testified that C had slept at the defendant's house the night before the attack and that the defendant was aware of that fact. C, however, testified that the only time she had ever been in the defendant's house prior to the night of the attack was, in passing, several weeks beforehand. The jurors also could have reasonably believed, as defense counsel asked them to, that C was motivated to fabricate the allegation against the defendant to help her mother avoid her obligation to pay rent to the defendant. This attack on C's credibility was based on the mother's text messages to the defendant and his girlfriend. Prior to the alleged attack, the mother had texted the defendant about C's staying overnight, to which he responded that, although it was fine if C stayed for short periods, her rent would increase if it became a long-term arrangement. Within one hour after C texted her mother for help, the mother sent both the defendant and his girlfriend separate messages about "suing [the defendant] for an automatic three months of rent," an odd topic

for her to raise immediately after C alleged that the defendant had sexually assaulted her.[6]

Therefore, I would not, as the majority does, consider the strength of the state's case as a factor cutting against the defendant's harm argument in any significant way, given that the evidence was not overwhelming and came down to a credibility contest. To be clear, my point is not that it would be unreasonable on this factual record for a jury to find the defendant guilty. Rather, I believe that, in the absence of the prosecutor's improprieties, a reasonable jury could also have rejected the credibility of the state's witnesses and therefore not found the state's evidence sufficient to prove the defendant's guilt beyond a reasonable doubt. In other words, sufficiency cannot be enough in this context. Even when the state's case contains some persuasive evidence, a benchmark of our justice system is that the defendant is entitled to a fair trial at which he may present his defense to the jury without the state distracting the jury with improper matters. I simply am not convinced that that the evidentiary record in this case suggests the defendant was able to do so.

I appreciate that the majority has warned against using *Williams* as an "arithmetic test for the level of prejudice flowing from [the prosecutorial improprie-

---

[6] Defense counsel questioned C's mother on this point:

"Q. Okay. And, at 11:36, you testified you were in a frantic state?

"A. Fran—yeah.

"Q. Okay. And you were so angry that fourteen minutes after the initial text, you texted my client about suing him for an automatic three months of rent to you?

"A. Okay. Yes.

"Q. Okay. So, my question is, you were upset about the alleged incident, correct?

"A. Of course.

"Q. But you were also concerned about getting three months of rent back to you?

"A. It was, I would say a moment of, again, looking for something to do when somebody has hurt your child to punish."

ties] . . . ." (Internal quotation marks omitted.) Part II of the majority opinion. I join that caution. I cannot help but point out, however, that the majority's analysis looks and feels much like an arithmetic test, mechanically prescribing that, for this court to consider reversing the defendant's conviction in this case, the prosecutorial improprieties must rise to an increased degree of egregiousness[7] because defense counsel failed to object. Rather, the majority should consider, overall, whether the defendant's trial was fair in light of those improprieties. Based on my analysis of the trial record, I would conclude that the state deprived the defendant of a fair trial given that the prosecutor's unprompted, unresponsive, and improper remarks implicated the central issue of credibility in the trial, distracted the jurors from that central factual issue, and distorted the state's burden of proof.

The state asks this court to excuse the prosecutorial improprieties in the present case because they took place during what it describes as the " 'rough and tumble' " of closing argument. The state likely makes this entreaty because this court routinely provides generous latitude to prosecutors, perhaps to a fault, so that they may zealously advocate the state's position before a

---

[7] I recognize that some of our case law supports the majority's contention that, when defense counsel fails to object to the improper remarks, as in the present case, "only instances of grossly egregious misconduct will be severe enough to mandate reversal." *State* v. *Thompson*, 266 Conn. 440, 480, 832 A.2d 626 (2003). But, given the number of factors that our precedent directs us to consider, under the specific facts of a particular case, without resort to "arithmetic" calculation, the supposedly "grossly egregious" standard is not always appropriate. For example, there is also case law that concludes that improprieties are severe based not solely on whether defense counsel objected to the remarks, but because they "denigrated the defense theory of the case by mischaracterizing it." *State* v. *Maguire*, supra, 310 Conn. 561. Therefore, although in some trials, a failure to object might be a "strong indication that [the impropriety] did not carry substantial weight"; *State* v. *Weatherspoon*, 332 Conn. 531, 558, 212 A.3d 208 (2019); that cannot be the case in all trials.

jury. In my view, however, that latitude is unwarranted here, considering that the prosecutor's improper and uninvited remarks in her rebuttal summation did not in fact *rebut* any argument the defendant had advanced. If what the state seeks is extra tolerance for clumsy or haphazard arguments that result in gratuitous and inappropriate remarks in rebuttal, my response is that there is too much at stake. It takes no lecture from a lone dissenter to appreciate, as I know that the state and the majority do, that an individual's liberty is on the line in a criminal case. The pressures that accompany attorneys into the litigation arena are hardly unique to prosecutors, or even to trial attorneys, and a defendant's fundamental right to a fair trial cannot be outweighed by the " 'rough and tumble' " of litigation. All lawyers, including those who argue cases before appellate courts (or hear them!), have undoubtedly said something on the record that they wish they could take back.

But it is the responsibility of the prosecutor, as a "minister of justice," to avoid veering into improprieties, and it is the responsibility of this court not to make a habit of excusing these sorts of improprieties because they were *perhaps* made in the "heat of the moment . . . ." *State* v. *Reynolds*, supra, 264 Conn. 205. Although we may not know if the prosecutor intended to make these plainly inappropriate arguments before the jury in this case, accommodating the prosecutor to the degree that the state suggests requires that we assume that she did *not* intend to weaponize the advantage provided to the state by our rules of practice when she saved these inappropriate remarks for rebuttal. See Practice Book § 42-35 (4) (referring to rebuttal as "final closing [argument]"). Indulging that assumption can sometimes strain credulity, as it does in this case, considering that, as the majority agrees, the improprieties were not responsive to anything that defense counsel had argued, and came toward the end of a short rebuttal argument, fol-

lowing an already short trial that hinged on credibility determinations.[8]

In my view, in the context of the present case, the prosecutor's conduct rendered the defendant's trial unfair, requiring a new trial. The improprieties distracted the jury from considering the defendant's theory of the case, distorted that theory, and implied that additional information, inaccessible to the jury, supported a guilty verdict. No amount of latitude for zealous advocacy— or the isolated nature of the improprieties, or the lack of objection by defense counsel, or the quality of the state's evidence—changes the fact that the defendant in this case is entitled to a fair trial at which he may present his defense to the jury, unencumbered by the prosecutor's injection of her own knowledge of standard defense strategies, along with crude, pejorative, and uninvited comments about those strategies. I do not believe the defendant was afforded that opportunity. Therefore, I respectfully dissent. I would reverse the judgment of the Appellate Court and remand the case for a new trial.

[8] The state reports to us in its brief that "[t]he prosecutor did not invent the 'nuts and sluts' phrase" but, rather, it "entered the public consciousness decades ago through the rise of workplace discrimination lawsuits and is often used to describe the defense tactic of portraying women who bring sexual harassment claims as being too unstable to be believed or too promiscuous to be harassed." Nevertheless, during oral argument before this court, without prompting, the state's appellate counsel, who was not trial counsel, sought to excuse what he admitted were the prosecutor's "inartful" and "unnecessary" "rhetorical flourishes" at trial (although he stopped short of conceding that they were improprieties) by asserting that the prosecutor's remarks were "not a prescripted, preplanned argument." A question from the court followed, asking how appellate counsel knew that these remarks were unplanned and therefore made in the heat of the moment. Had the same prosecutor used this crass phrase at other times, in other cases, the court queried? Appellate counsel hadn't asked her, so he did not know. I am therefore unable to evaluate the basis for the representation that these improprieties were not "prescripted," as opposed to remarks that the prosecutor, if given the opportunity, planned to deliver, believing they would strike jurors as clever and memorable enough to bring with them into the deliberation room, no matter how ill-fitting or unresponsive they were to defense counsel's actual arguments.